2007-NMCA-008

150 P.3d 375

STATE of New Mexico ex rel. OFFICE OF the STATE ENGINEER and Pecos Valley Artesian Conservancy District, Plaintiffs–Appellees,

v.

L.T. LEWIS et al., Defendants–Appellants,

and

United States of America and Carlsbad Irrigation District, Defendants–Appellees.

No. 25,522.

Court of Appeals of New Mexico.

Nov. 16, 2006.

**2**

DL Sanders, Special Assistant Attorney General, Tanya Trujillo, Special Assistant Attorney General, William S. Cassel, Special Assistant Attorney General, Office of the State Engineer, Santa Fe, NM, for Appellee State of New Mexico ex rel. State Engineer.

Hinkle, Hensley, Shanor & Martin, L.L.P., Stuart D. Shanor, Roswell, NM, Hennighausen & Olsen, L.L.P., Fred H. Hennighausen Roswell, NM, Richard A. Simms, Hailey, ID, for Appellee Pecos Valley Artesian Conservancy District.

White, Koch, Kelly & McCarthy, P.A., Paul L. Bloom, Santa Fe, NM for Appellants.

Hubert & Hernandez, P.A., Beverly J. Singleman, Las Cruces, NM for Appellee Carlsbad Irrigation District.

## OPINION

SUTIN, Judge.

{1} The Pecos River, flowing from north (upstream) to south (downstream) in New Mexico and then into Texas, has challenged water experts for well over a hundred years, without meaningful resolution of the issues of rampant usage with attendant shortages.

{2} In significant part, the Pecos River issues have revolved around: (1) the competing claims of downstream, senior surface water users in the Carlsbad, New Mexico area and upstream, junior groundwater users in New Mexico's Roswell Artesian Basin; and (2) the competing claims of New Mexico users and Texas users. The present case involves the attempt by the State of New Mexico, the United States, and irrigation entities through a settlement agreement to resolve difficult long-pending water rights issues through public funding, without offending New Mexico's bedrock doctrine of prior appropriation, and without resorting to a priority call. In this case, certain downstream, senior surface water users, specifically Tracy/Eddy Trusts and Farms (Tracy/Eddy), and Hope Community Ditch Association (Hope), who are the Appellants in this appeal, seek to abort that attempt and to require the doctrine of prior appropriation to be strictly enforced through senior against junior priority enforcement in order to assure adequate water for the downstream users and additionally to assure that the upstream, junior users and not the State's taxpayers bear the burden of providing adequate water.

{3} Appellees, who are Carlsbad Irrigation District (CID), Pecos Valley Artesian Conservancy District (PVACD), and the State of New Mexico, seek ratification of a settlement agreement among themselves and the United States establishing a managed water plan for

the Pecos River, which recognizes prior appropriation rights but subsumes individual interests to collective and representative bodies. We affirm the judgments in favor of Appellees, including the partial final decree that incorporates the settlement agreement.

{4} We begin with a thumbnail history of significant events in relation to the Pecos River, followed by a review of the court determination that is the subject of the appeal now before this Court. We then discuss the points raised by Appellants.

## HISTORY

### A. A BRIEF LOOK AT TWENTIETH CENTURY ACTIVITY

{5} Jumping over nineteenth century Pecos River water issues, we start with the point at which the United States became involved with Pecos River water concerns. *See generally* G. Emlen Hall, *High and Dry: The Texas–New Mexico Struggle for the Pecos River* (2002) [hereinafter Hall, *High and Dry* ]; *Water Resources of the Lower Pecos Region, New Mexico: Science, Policy and a Look to the Future* (Peggy S. Johnson et al. eds., 2003) [hereinafter *Water Resources* ]. Following the 1904 Pecos River flood, the newly created United States Reclamation Service (later called the Bureau of Reclamation) became involved in a federal reclamation project located on the Pecos River called the Carlsbad Project, which consists of several dams, reservoirs, canals, and other works on the river. *See* Hall, *High and Dry, supra,* at 31, 36; *see also Brantley Farms v. Carlsbad Irrigation Dist.,* 1998–NMCA–023, ¶ 26, 124 N.M. 698, 954 P.2d 763. The Bureau of Reclamation owns the reservoirs and other works servicing water users in the Carlsbad area, and owns and administers the Carlsbad Project. *Brantley Farms,* 1998–NMCA–023, ¶ 26, 124 N.M. 698, 954 P.2d 763. At the time of our statehood in 1912, and even before then, there existed issues of protection of downstream, senior users and Texas users from upstream, junior users. *See* Hall, *High and Dry, supra,* at 42–43.

{6} From these early times forward, the quest to resolve the water issues involved several significant activities and events. In 1920, in *United States v. Hope Community Ditch,* Cause No. 712 (Equity) (D.N.M.1933),

the United States sought a Pecos River stream system adjudication to establish downstream senior surface water rights. Entered in 1933, the final decree in the *Hope Community Ditch* adjudication (the Hope decree) recognized 1887 priorities for Hope farmers and for the irrigation area that included what is known as the Tracy/Eddy farmlands in the Carlsbad area. The Hope decree also recognized 25,055 water right acres in the Carlsbad Project along with a corresponding duty of water, three acre feet per year per acre. Hall, *High and Dry, supra,* at 41–42, 257 n. 33. However, while the Hope decree recognized that downstream users had certain senior rights to surface water, the decree was problematic because it did not include claims to interrelated groundwater. *See* Hall, *High and Dry, supra,* at 41–42; *cf. Cartwright v. Pub. Serv. Co. of N.M.,* 66 N.M. 64, 76, 343 P.2d 654, 662 (1958) (determining that the Hope decree was not res judicata with respect to entities that were not a party to the federal action), *overruled on other grounds by State ex rel. Martinez v. City of Las Vegas,* 2004–NMSC–009, 135 N.M. 375, 89 P.3d 47.

{7} It was during the *Hope Community Ditch* adjudication that Carlsbad area users organized the Carlsbad Irrigation District (the CID), which was court-approved in 1933. *See Tompkins v. Carlsbad Irrigation Dist.,* 96 N.M. 368, 370, 630 P.2d 767, 769 (Ct.App. 1981). The CID was formed in cooperation with the Bureau of Reclamation pursuant to New Mexico law and is a "body corporate and politic." *Id.; see Brantley Farms,* 1998–NMCA–023, ¶¶ 2, 26, 124 N.M. 698, 954 P.2d 763; *see also* NMSA 1978, §§ 73–10–1 to –50 (1919, as amended through 2003) (providing for the creation of irrigation rights); NMSA 1978, §§ 73–13–43 to –46 (1934) (validating irrigation districts as "continued bodies corporate and politic"). The CID board of directors has broad powers to act on behalf of the CID, including authority to acquire and deal with water rights. *See* § 73–10–16. The CID board also has discretionary authority to make decisions on behalf of its constituent members regarding distribution and use of water supply. *Id.;* § 73–10–24;

*Brantley Farms,* 1998–NMCA–023, ¶ 23, 124 N.M. 698, 954 P.2d 763.

{8} The CID is one of three irrigation entities established on the Pecos River. Another is the Fort Sumner Irrigation District (the FSID), which received Bureau of Reclamation funds to reconstruct a diversion dam. Like the CID, the FSID is an irrigation district cooperating with the United States. *See* John W. Utton, *Irrigation Districts in New Mexico: A Legal Overview of Their Role and Function,* in *Water Resources* 55, 55. The third irrigation entity is the Pecos Valley Artesian Conservancy District (the PVACD), which, like the CID and the FSID, is a political subdivision of the state. *Id.; see* NMSA 1978, § 73–1–11 (1931). The PVACD was formed in 1932 to conserve groundwater in the Roswell Artesian Basin, following the New Mexico Legislature's enactment in 1931 of a groundwater code aimed at conservation of artesian waters. *See* 1931 N.M. Laws ch. 97, § 1 (codified at NMSA 1978, § 73–1–1 (1931)); *see also* John W. Shomaker, *How We Got Here: A Brief History of Water Development in the Pecos Basin,* in *Water Resources* 61, 63. Groundwater development in the Roswell Artesian Basin was unregulated prior to 1931. Shomaker, *supra,* at 63.

{9} In 1949, after negotiations occurring over many years, an interstate compact called the Pecos River Compact (the Compact) became established law for the Pecos River in relation to the water use issues between New Mexico and Texas. 81 Cong. ch. 184, 63 Stat. 159 (1949); *see* Hall, *High and Dry, supra,* at 45–48, 66, 77. The Compact was ratified and adopted in 1949 by the New Mexico Legislature. *See* NMSA 1978, § 72–15–19 (1949) (setting out the Compact). Among other provisions, the Compact required New Mexico to make up for under-deliveries of water to Texas. *See* § 72–15–19 art. III(a) ("New Mexico shall not deplete by man's activities the flow of the Pecos river at the New Mexico–Texas state line below an amount which will give to Texas a quantity of water equivalent to that available to Texas under the 1947 condition."); Hall, *High and Dry, supra,* at 49. Water shortages continued despite the existence and purposes of the irrigation districts and the authority of New Mexico's State Engineer, and despite the obligations placed on New Mexico under the Compact.

{10} In 1974, because New Mexico did not fulfill its Compact obligations, Texas sued New Mexico to enforce the Compact. Texas' lawsuit against New Mexico was finally decided by the United States Supreme Court in an amended decree (the amended decree) entered in 1988. *Texas v. New Mexico,* 485 U.S. 388, 108 S.Ct. 1201, 99 L.Ed.2d 450 (1988) (per curiam); *see* Hall, *High and Dry, supra,* at 51, 72–73, 193; John E. Thorson, *The U.S. Supreme Court in an Original Jurisdiction Action: Texas v. New Mexico, No. 65 Orig. (Pecos River),* in *Water Resources* 47, 47–48. The amended decree added significant stress to New Mexico's continual Pecos River water shortage concerns. Among other provisions, the amended decree required the appointment of a River Master to oversee water deliveries and assure New Mexico's compliance and also required New Mexico, by injunction, to meet its Compact obligation to deliver water to Texas at the state line and to submit a proposed plan to erase any state line delivery shortfall. *Texas v. New Mexico,* 485 U.S. at 389–91, 108 S.Ct. 1201 (specifically II(A)(2), (3), III(B)). Under the amended decree, if, based on findings of the River Master, New Mexico does not measure up to its compliance obligations, the River Master is to give New Mexico a six-month grace period to come up with water equaling under-delivery to the state line. If New Mexico does not meet this deadline, the State will face administrative action by the River Master to ensure delivery. Aptly stated by one of the experts in the present case, Dr. Lee Wilson, "[i]n effect the Court imposed an administrative enforcement and remediation process that was not provided by the Compact itself, with the ultimate threat of a federal takeover of management."

{11} Another very significant litigation in the Pecos River history is the case which is before this Court in the present appeal and which is part of a longstanding adjudication commonly known as the *Lewis* litigation. This litigation was initiated in 1956 by the New Mexico State Engineer in two separate but parallel lawsuits, *State ex rel. State Engi-*

neer v. Lewis, No. 20,294 (N.M. Chaves County Dist. Ct.), State ex rel. State Engineer v. Hagerman Canal Co., No. 22,600 (N.M. Chaves County Dist. Ct.). Consolidated in 1966, the lawsuits were aimed at quieting title to all groundwater rights in the Roswell Artesian Basin and the surface water rights in the Hagerman Canal. See State v. Allman, 78 N.M. 1, 427 P.2d 886 (1967) (discussing the Chaves County actions brought by the State Engineer and the PVACD). In that litigation, the CID in 1976 filed a written priority call demand with the State Engineer, based on surface water shortage concerns. However, apparently based at least in part on the inconsistency between (1) protecting downstream, senior water users from shortages, and (2) asserting in Texas' action against New Mexico that New Mexico was not violating the Compact, the State Engineer did not proceed with a priority call to curtail uses in the Roswell Artesian Basin. In 1978 the State Engineer transformed this Lewis litigation into an adjudication of the entire Pecos River stream system. See State ex rel. Reynolds v. Pecos Valley Artesian Conservancy Dist., 99 N.M. 699, 663 P.2d 358 (1983); State ex rel. Reynolds v. Lewis, 88 N.M. 636, 545 P.2d 1014 (1976); 84 N.M. 768, 508 P.2d 577 (1973); 74 N.M. 442, 394 P.2d 593 (1964); see also Allman, 78 N.M. at 1–2, 427 P.2d at 886–87 (referring to the 1956 Lewis action); Hall, High and Dry, supra, at 256 n. 32 (stating that "[a]ll the Lewis decisions arose out of a comprehensive readjudication of surface water and groundwater claims within the Pecos River drainage basin 'necessitated by the fact' that the Hope Community Ditch litigation had not included groundwater").

## B. THE RISE OF THE PRESENT ISSUES

### 1. New Mexico's Compact Compliance Statute

{12} After the United States Supreme Court entered the amended decree in 1988, the New Mexico Interstate Stream Commission (the Stream Commission) created the Lower Pecos River Advisory Committee to develop a consensus plan that would achieve compliance with the amended decree. See

Reese Fullerton, Building Consensus: A Plan for Long-term Management, in Water Resources 109, 110. A consensus plan was submitted to the New Mexico Legislature, resulting in a substantial appropriation of funds for implementing the key elements of the plan. Id. at 110. The plan was essentially endorsed when the Legislature enacted NMSA 1978, § 72–1–2.4 (2002) (the compliance statute), for the express purpose of achieving compliance with New Mexico's obligations under the Compact. See § 72–1–2.4(A). The purpose of the compliance statute is to establish a base flow of the river and provide a reliable annual irrigation supply (a) for delivery of a designated amount of acre feet per acre of irrigated land in the CID, and (b) for adequate water to fulfill delivery requirements to the Texas state line. Id. The statute contemplates the appropriation of funds and authorizes the Stream Commission to fund projects to accomplish compliance with the Compact:

> The interstate stream commission shall determine the need for projects to be funded with the appropriations for compliance with the Pecos River Compact and may expend funds for the purchase of land with appurtenant water rights or rights to the delivery of water and to take other appropriate actions that would effectively aid New Mexico in compliance with the United States supreme court amended decree in Texas v. New Mexico, No. 65 original.

§ 72–1–2.4(B). As a condition to the expenditures of appropriated State funds by the Stream Commission, the compliance statute requires that the Stream Commission has entered into contracts with the governing bodies of the CID, the PVACD, and the FSID. § 72–1–2.4(C). The FSID is not a party to the case before us.

### 2. The Lewis Case, Presently

{13} The present Lewis appeal derives from the district court's inter se adjudication of the water rights for the Carlsbad Project. Those water rights were initially claimed by the United States of America, the CID, and individual users within the CID, to the exclusion of one another. The claims were disputed in substantial part by the State of New

Mexico and the PVACD. The phase of the adjudication relevant to this appeal was initiated by a stipulated offer of judgment in 1994 by the State. *See* NMSA 1978, § 72–4–15 (1907) (authorizing the state engineer through the attorney general to initiate suits to determine water rights). The offer of judgment set forth the elements of the rights of the United States and the CID to divert and store, and the CID's right to deliver, waters of the Pecos River for the Carlsbad Project. Hundreds of objections to the offer of judgment were filed by water right owners on the Pecos River and its tributaries. PVACD was one of the objectors. The objections placed at issue virtually every element of the rights accorded to the United States and the CID in the offer of judgment. Between 1996 and 2002, the district court decided several "threshold legal issues," still, however, leaving the court and parties with the prospect of litigating the merits of the objections raised, which would involve extensive development of expert testimony, historical research, discovery, and a lengthy trial on the merits.

{14} But the process turned toward negotiation. After the enactment of the compliance statute in 2002, the *Lewis* litigation became the avenue for the State of New Mexico, the United States, the CID, and the PVACD to work on resolving the unfinished and difficult Pecos River water issues. Prompted by the compliance statute, the State of New Mexico, the United States, the CID, and the PVACD (altogether, the negotiating parties) negotiated a settlement agreement and proposed partial final decree in March 2003. In March and May 2003, the negotiating parties filed joint motions for entry of the proposed partial final decree incorporating the settlement agreement and for entry of a scheduling and procedural order that would establish a process for notifying interested parties and for allowing objections.

{15} Moving the process along, the court entered a scheduling and procedural order in October 2003, and a notice approved by the district court was published and also sent to hundreds of interested or potentially affected persons. The notice described the settlement agreement and proposed partial final decree. The court gave a helpful bird's-eye view of the proposed partial final decree as follows:

> The proposed [Partial Final] Decree judicially establishes the maximum allowable annual diversion and storage rights of the United States and CID, and CID's right to deliver water for the members of the CID. Each individual CID member's surface water rights, to be further determined in the Membership Phase of the Carlsbad Irrigation District Sub–Section of these proceedings, shall be limited by the diversion, storage, and delivery rights held by the United States and CID and shall be subject to applicable state and federal law. Under the proposed decree, the United States and CID shall have the right to divert and to store public surface waters from the Pecos River stream system to irrigate an area within the CID (a/k/a the "Carlsbad Project") not exceeding 25,055.00 acres.

The court also summarized the settlement agreement as follows:

> The Settlement Agreement, which is an integral part of the Partial Final Decree adjudicating the diversion and storage rights of the United States and CID for the Carlsbad Project, is a water conservation plan among the State, ISC, the United States Department of the Interior, Bureau of Reclamation, CID, and PVACD designed to augment the surface flows of the lower Pecos River to: (a) secure the delivery of Project water; (b) meet the State's obligations to the State of Texas under the Pecos River Compact; and, (c) limit the circumstances under which the United States and CID are entitled to make a call for the administration of water right priorities. Among other points summarized below, fundamental to the Settlement Agreement is the construction or development of a wellfield (the "Augmentation Wells") to facilitate the physical delivery of groundwater directly into the Pecos River under certain, specified conditions, the purchase and transfer to the wellfield of existing groundwater rights in the Roswell Artesian Basin ("RAB") by the ISC, and the

purchase and retirement of irrigated land within PVACD and CID. The Settlement Agreement also defines the conditions under which the land purchased by the ISC in the CID will be allotted and receive water.

{16} The purpose of the notice was "to inform all defendants in the Pecos River stream system water rights adjudication and all persons claiming water rights in the Pecos River stream system whose water rights interests may be affected by the proposed Partial Final Decree of [ ] their right to object to all or any part of [the] proposed Partial Final Decree." The notice indicated what recipients would need to do in response to the notice, giving them an opportunity to object to the settlement agreement and proposed partial final decree. The court's scheduling and procedural order stated that those objecting "to all or any part of the water rights that would be adjudicated by the proposed Partial Final Decree" had the "initial burden to make a *prima facie* case showing how the[ir] water rights . . . will be adversely affected by the priority, amount, purpose, periods and place of use, or other matters as set forth in the Proposed Partial Final Decree." *See* NMSA 1978, § 72–4–19 (1907) (stating that a decree adjudicating water rights shall declare as to the water right adjudged to each party the priority, amount, purpose, periods, and place of use). Five objected. The objections of three of the objectors were resolved and withdrawn. The two remaining objectors were Tracy/Eddy and Hope. Tracy/Eddy own approximately five hundred acres of senior (1887) CID served lands. Hope is an acequia association comprised of forty-two farm families and owns approximately 2759.25 acres of senior (1887) rights to use Peñasco River (a Pecos River tributary) surface waters.

{17} Appellants' objections, which were filed in March 2004, became the subject of dispositive motions filed by Appellees PVACD, the CID, and the State of New Mexico in September 2004. The district court granted these motions in November 2004, dismissing the objections filed by Appellants. The court entered the partial final decree (the settlement decree), incorporating

the negotiating parties' settlement agreement as an integral part of the settlement decree. In the settlement decree, the district court concluded:

3. The Court has jurisdiction over the parties and the subject matter of these proceedings for purposes of determining and adjudicating, between and among the United States, the State, the CID, the PVACD, and all other defendants in this proceeding, the United States' and CID's maximum allowable annual diversion and storage rights; and the CID's right to deliver water for the members of the CID, and the administration of such rights as determined by the Court.

4. This Decree and the Settlement Agreement attached hereto and incorporated herein settle the surface water claims of the CID and the United States as contemplated by and for the purposes of [Section] 72–1–2.4(D)(1)(c) (2002). As contemplated by and for the purposes of [Section] 72–1–2.4(C), the Settlement Agreement attached hereto and incorporated herein and the FSID/ISC [Interstate Stream Commission] Agreement, include agreements with the governing bodies of the ISC, the CID, the PVACD and the FSID that specify the actions the parties agree will be taken or avoided to ensure that the expenditures by the ISC authorized under [Section] 72–1–2.4 will be effective toward permanent compliance with New Mexico's obligations under the Pecos River Compact and the Pecos River Decree.

The court also determined that "[t]he Settlement Agreement and the FSID/ISC Agreement satisfy [Section] 72–1–2.4, which requires that the ISC enter into agreements with PVACD, CID and FSID."

{18} Further, the court judicially established the maximum allowable annual diversion and storage rights of the United States and the CID, and the CID's right to deliver water for members of the CID. In regard to each individual CID member's surface water rights, the court stated that these rights were to be later determined in the "Membership Phase" of the litigation. However, the court specifically stated that each individual

CID member's surface water rights "shall be limited by the diversion, storage, and delivery rights held by the United States and the CID and shall be subject to applicable state and federal law."

### 3. The Appellate Issues

{19} Appellants are in this fight because, in their view, they have been victims of water shortages for many years and the settlement agreement and settlement decree (together, the settlement agreement and decree) will not alleviate the chronic water shortages that have plagued them. As we will discuss, Appellants directly attack the settlement agreement and decree as violating the New Mexico Constitution and the Compact. In addition, they indirectly attack the settlement agreement and decree by attacking the power of the court to enter the settlement decree based on the settlement agreement. They also assert that genuine issues of material fact exist precluding summary judgment.

{20} Specifically, in their direct attack on the settlement agreement and decree, Appellants first contend that the settlement agreement's invasion against downstream, senior rights violates the Constitution and law of New Mexico by not requiring the application of New Mexico's embedded doctrine of prior appropriation to resolve the problem of chronic shortages for senior users. This attack is based on Article XVI, Section 2 of the New Mexico Constitution which states that "[p]riority of appropriation shall give the better right." The attack is also based on Article IX of the Compact, which states that "[i]n maintaining the flows at the New Mexico–Texas state line required by this compact, New Mexico shall in all instances apply the principle of prior appropriation within New Mexico." § 72–15–19. The prevalent view seems to be that Article IX of the Compact was obtained by CID representatives who wanted to assure that Texas shortages would not be made up out of CID reservoirs but rather by junior Roswell Artesian Basin users. *See* G. Emlen Hall, *Priority on the Pecos*, in *Water Resources* 58, 59.

{21} The second barrel of Appellants' double-barreled direct attack is based on the "anti-donation clause" in Article IX, Section 14 of the New Mexico Constitution. Appellants contend that the anti-donation clause prohibits the payment of State monies to junior users for their rights or to otherwise provide water to protect those junior users, when enforcement of priority against those junior rights holders would produce the desired and required water, when needed, at no cost to New Mexico taxpayers.

{22} Apart from these direct constitutional and Compact-based attacks, Appellants contend that the settlement decree exceeded the power and authority of the district court. Appellants assert that the court cannot order into effect a program to spend public money to buy and transfer water rights, construct augmentation wells to supplement river flows, and make the State the largest landowner in the CID, in order to ensure Compact deliveries on CID allocated water. As their last ground, Appellants contend that there exist genuine issues of material fact precluding summary judgment. They assert that they effectively disputed material factual assertions by Appellees as to the impracticability and ineffectiveness of a priority call and as to the reliability of Appellees' predictions about the anticipated success of the settlement agreement in resolving water shortage problems.

{23} We now address Appellants' claims, each of which leaves us unpersuaded that we should reverse the district court on any of Appellants' points for reversal.

### STANDARD OF REVIEW

{24} In reviewing a summary judgment, we determine whether the party in whose favor judgment was granted was entitled to judgment as a matter of law. *See Self v. United Parcel Serv., Inc.*, 1998–NMSC–046, ¶ 6, 126 N.M. 396, 970 P.2d 582. Where the facts are undisputed, we review the legal questions de novo. *See id.* Once the movant makes a prima facie showing, the non-moving party must "demonstrate the existence of specific evidentiary facts which … require trial on the merits." *Roth v. Thompson*, 113 N.M. 331, 334–35, 825 P.2d 1241, 1244–45 (1992). In reviewing whether a factual dispute exists, we review the record in a light most favorable to the non-moving party. *Williams v. Stewart*, 2005–NMCA–061, ¶ 8,

137 N.M. 420, 112 P.3d 281. That is, we "construe reasonable inferences from the record in favor of the party opposing the motion." *Celaya v. Hall*, 2004–NMSC–005, ¶ 7, 135 N.M. 115, 85 P.3d 239. Summary judgment is appropriate where there is no evidence raising a reasonable doubt that a genuine issue of material fact exists. *See Cates v. Regents of N.M. Inst. of Mining & Tech.*, 1998–NMSC–002, ¶ 9, 124 N.M. 633, 954 P.2d 65.

## DISCUSSION

### A. THE PRIOR APPROPRIATION DOCTRINE

{25} Appellants' flagship contentions are that the settlement agreement violates the doctrine of prior appropriation adopted in Article XVI, Section 2 of the New Mexico Constitution and required in Article IX of the Compact. Appellants assert that, because of longstanding chronic shortages for senior CID and Hope farmers, the negotiating parties and the district court were duty-bound to adhere to the prior appropriation doctrine as it has been traditionally understood and enforced, through priority administration, which, for Appellants, means priority enforcement through a priority call.

### 1. The Prior Appropriation Issue as Framed by Appellants

{26} The stress on Pecos River water is obvious and substantial. The issue before us is a limited but important one: whether the doctrine of prior appropriation requires that resolution of the existing and projected future water shortage issues be attempted exclusively through the procedure of a priority call. In other words, we consider whether a priority call is necessarily the only method of Pecos River water administration and resource management that can be used in the face of water shortages, in light of Article XVI, Section 2 of the New Mexico Constitution and Article IX of the Compact.

{27} Appellants argue that New Mexico cases and the Compact adhere to, and New Mexico's adjudication statutes implement, the Constitution's prior appropriation doctrine and, therefore, adjudication of water rights has always required and still requires application of priority enforcement through a priority call. Appellants emphasize that, in spite of the Constitution, Compact, statutes, and case law, New Mexico failed and refused to enforce priority rights in the Pecos River throughout the twentieth century, up to the present. They emphasize, too, that the "fundamental principle" of the doctrine of prior appropriation, one which had its origin in Spanish and Mexican law before 1848, is "first in time, first in right," and one in which the earliest appropriator has an exclusive right "to the use of the water to the extent of his appropriation, without material diminution in quantity or deterioration in quality." *See State ex rel. State Game Comm'n v. Red River Valley Co.*, 51 N.M. 207, 217, 182 P.2d 421, 427 (1945) (holding Article XVI, Section 2 of the New Mexico Constitution "is only declaratory of prior existing [New Mexico] law, always the rule and practice under Spanish and Mexican dominion" (internal quotation marks and citation omitted)); *Yeo v. Tweedy*, 34 N.M. 611, 613–16, 286 P. 970, 972–73 (1929) (affirming that prior appropriation was the law of New Mexico under Mexican sovereignty and continuing thereafter, with the New Mexico Constitution as merely declaratory of existing law); 1 Wells A. Hutchins, *Water Rights Laws in the Nineteen Western States* 157 (1971). And Appellants further emphasize that central to the doctrine of prior appropriation is the superiority of senior rights and enforcement of those superior rights through priority calls in times of water shortages.

{28} Appellants condemn the "new river management machinery (the Settlement Agreement), that not only ignores priority enforcement but explicitly waives and prohibits it." The settlement agreement provision to which Appellants refer as waiving and prohibiting priority enforcement reads, in part, as follows:

> Notwithstanding the provisions of the [Partial Final Decree] and the rights and priorities therein established, neither CID nor the United States shall place a call for administration of priorities or otherwise seek to curtail water uses in the RAB, and neither CID nor the United States shall store or divert water resulting from a call or curtailment exercised by others (includ-

ing specifically but without limitation for the delivery of water to the New Mexico–Texas state line for purposes of compliance with the Pecos River Compact or any United States Supreme Court Decree or court order relating thereto), except to the extent necessary to supply not more than 50,000 acre-feet in any one year at the Avalon Dam gate for delivery into the CID main canal.... Neither the CID nor the United States shall place a call for water into storage for carry-over into a subsequent irrigation season. Upon the exercise of a call by [the] CID or the United States hereunder, the CID or the United States may request the State Engineer to initiate priority administration pursuant to law to curtail the use of water under water rights junior to the adjudicated rights of [the] CID and/or the United States to the extent necessary to supply the amount of the call.

{29} Appellants rely heavily on *Reynolds (1983)*, arguing that pursuant to *Reynolds (1983)* "[t]he adjudication of enforceable prior rights to CID members has been explicitly confirmed by the New Mexico Supreme Court in th[e] [Lewis] case." *Reynolds (1983)* was a prior appeal in this action to adjudicate the surface and groundwater rights to the entire Pecos River stream system. 99 N.M. at 700, 663 P.2d at 359. In *Reynolds (1983)*, the PVACD and the Hagerman Canal Company (related to the Village of Fort Sumner) appealed after the district court adopted certain adjudication procedures proposed by the State that related to priorities affecting the CID. *Id.* After noting that "[t]he adjudication in the instant case is a massive undertaking[,]" our Supreme Court recited the history leading to the case before it. *Id.* Initially an adjudication of the groundwater diversions in the Roswell Artesian Basin and later consolidated with the Hagerman Canal adjudication, the suit was expanded in 1974 to include both the surface and groundwater uses in the tributary Rio Hondo system. *Id.* After that, in 1976, the CID, operating the 25,055 acre Carlsbad Project "with priorities dating back to 1887, formally requested the state engineer to admin-

ister the Pecos River in accordance with the doctrine of prior appropriation," after which the State Engineer "decided to expand the suit to embrace all of the rights in the Pecos River stream system above the [CID's] point of diversion, Avalon Dam." *Id.*

{30} The issue before the Supreme Court in *Reynolds (1983)*, however, was a limited one, namely whether the procedure adopted by the district court for adjudicating rights improperly modified the "usual procedure" of first adjudicating various claimants' rights as against the State and then allowing individuals to contest *inter se* "any individually adjudicated rights," before entering a final decree that "appoints a watermaster to administer the interrelated rights as shortage necessitates." *Id.* The Court decided that procedural issue, but offered the following statement regarding procedures to be used in the administration of junior and senior rights.

> While expediting priority administration, the procedure affords each defendant the opportunity to establish his priority and to contest the priority of the [CID]. The court will first determine which junior rights must, without question, be terminated to satisfy the senior rights of the [CID], the United States, or the individual water users served by the [CID]. Then the court will adjudicate all of the stream system priorities in reverse order, simultaneously ordering each junior user to show cause why his rights should not be terminated to satisfy such senior rights.

*Id.* at 701, 663 P.2d at 360. Appellants assert that this statement sets a precedent for priority enforcement, and that the priority enforcement procedure set out must be applied presently with respect to upstream, junior users and downstream, senior users. They assert standing to insist on priority enforcement as is, they believe, required by *Reynolds (1983)*, based on the district court's threshold determination in the present case that "the beneficial ownership of Project water rights is vested in landowners in the Project measured by the amount of water devoted to beneficial use,"[1] plus the right

---

1. In November 1997, the district court in an "Opinion Re Threshold Legal Issue No. 3" deter-

mined that Carlsbad Project water rights were owned by members of the CID but that the

given them and the landowners in Hope to object to the settlement agreement.

{31} As we more fully discuss in the following section of this opinion, we decide the prior appropriation issues in favor of Appellees.

## 2. The Settlement Agreement and Decree

{32} By their settlement agreement, the negotiating parties sought to cut the water shortage Gordian knot through a process more flexible than strict priority enforcement, yet still comply with the doctrine of prior appropriation. The settlement agreement and decree are constitutional and an otherwise lawful resolution of the longstanding water rights and shortages issues.

### a. Presumption of Constitutionality

{33} In entering into the settlement agreement, the Stream Commission was acting pursuant to authority granted by the compliance statute. The Legislature was obligated to act in an appropriate and effective manner to assure compliance with the amended decree. By enactment of the compliance statute, the Legislature called upon a state agency, the Stream Commission, to act, and authorized a procedure pursuant to which the Pecos River shortage problems might be resolved. The Legislature in effect charged the Stream Commission with the job of attempting to enter into agreements with the CID and PVACD on "actions that would effectively aid New Mexico in compliance with the ... amended decree." § 72–1–2.4(B), (C). At the same time, the State had the obligation to attempt to assure protection of senior water rights. *See* § 72–1–2.4(A).

{34} While not a grant of regulatory authority with the power to enact rules or regulations, the compliance statute can be considered enabling and remedial legislation that (a) empowers and requires a government agency to determine the need for projects to protect and use water resources, and (b) authorizes that agency to expend appropriated funds to carry out the projects. *See*

§ 72–1–2.4(B), (C). The intent and purpose of the legislation is beyond dispute—to take charge of resolving a critical situation created by the amended decree, while complying with the State's obligation to protect downstream, senior users. The compliance statute leaves implementation to specific critical governmental players. Implementation necessarily means establishing in detail the process broadly set out in the compliance statute to achieve the base flow and annual irrigation supplies required under the compliance statute.

{35} As we have indicated, we read the compliance statute to unmistakably intend, if not to some degree mandate, that a particular process of augmentation and public funding be implemented to attempt to fulfill the State's Compact obligations and at the same time supply adequate surface water to those holding downstream, senior rights. We must assume that the Legislature was aware of the prior appropriation doctrine. By its silence as to strict priority enforcement and its express intent to attempt resolution through land and water rights purchases using public funding, we also read the compliance statute as intending the land and water rights purchases, and perhaps other actions, to be a first response to the shortage and Compact compliance concerns, rather than resort to a priority call as a first or exclusive response. The enactment of the compliance statute is correctly to be read as a clear signal that the Legislature and governmental players wanted to create a solution other than a priority call as the first and only response. As we discuss, this does not in and of itself abrogate the system of priority enforcement.

{36} Thus, as long as the process selected by the negotiating parties and placed in the settlement agreement and approved by the court is within the statutory authorization and mandate, were we to invalidate the process, we would, in effect, be undermining the Legislature's enactment. We therefore view Appellants' direct constitutional attacks on the settlement agreement and decree to be,

United States and the CID had ownership rights and interests in Project water rights. The court concluded that it could adjudicate the storage and diversion rights of the United States and the

CID. The court deferred for subsequent proceedings a determination regarding the need for adjudication of "elements of Project water rights to landowners individually."

in effect, subsurface, indirect constitutional attacks on the authorizing legislation. We will assume, without deciding, that, in allowing persons to object to the settlement agreement on any ground, the district court intended to permit objectors to attack the constitutionality of the settlement agreement and decree as Appellants have without directly attacking the constitutionality of the statute.[2]

{37} We presume "that the Legislature has performed its duty, and kept within the bounds fixed by the Constitution." *State ex rel. Pub. Employees Ret. Ass'n v. Longacre*, 2002–NMSC–033, ¶ 10, 133 N.M. 20, 59 P.3d 500 (internal quotation marks and citation omitted); *see City of Las Cruces v. El Paso Elec. Co.*, 1998–NMSC–006, ¶ 21, 124 N.M. 640, 954 P.2d 72 (stating that the appellate courts presume the constitutionality of a statute). Further, if possible, we will "give effect to the legislative intent unless it clearly appears to be in conflict with the Constitution." *Longacre*, 2002–NMSC–033, ¶ 10, 133 N.M. 20, 59 P.3d 500 (internal quotation marks and citation omitted). We will not question the wisdom, policy, or justness of a statute, and the burden of establishing that the statute is invalid rests on the party challenging the constitutionality of the statute. *Madrid v. St. Joseph Hosp.*, 1996–NMSC–064, ¶ 10, 122 N.M. 524, 928 P.2d 250. "[A]n act of the Legislature will not be declared unconstitutional in a doubtful case, and . . . if possible, it will be so construed as to uphold it." *Yeo*, 34 N.M. at 625, 286 P. at 976. We see no reason why these presumptions and rules in regard to statutes should not also, under the circumstances in this case, extend to the constitutionality of the implementation of the statute enacted, when there exists no showing that the implementation was outside the detailed authorizations and specific requirements of the statute. We therefore presume the constitutionality of the settlement agreement insofar as it is within the authorization and not in violation of the compliance statute. For the reasons we next discuss, Appellants have not overcome the

presumption. Further, even were no presumption to apply, Appellants have not made a case for strict priority enforcement through a priority call.

**b. Constitutionality of a Flexible Approach**

{38} We see no reason to read Article XVI, Section 2 of the Constitution and Article IX of the Compact to require a priority call as the first and only, and thus exclusive, response to water shortage concerns. Rather, we think it reasonable to construe these provisions to permit a certain flexibility within the prior appropriation doctrine in attempting to resolve the longstanding Pecos River water issues. We do not find in the language of the Constitution or the Compact an exclusive right to a priority call. The relevant provisions do not by their terms require strict priority enforcement through a priority call when senior water rights are supplied their adjudicated water entitlement by other reasonable and acceptable management methods.

{39} Thus, although priority calls have been and continue to be on the table to protect senior users' rights, such a fixed and strict administration is not designated in the Constitution or laws of New Mexico as the sole or exclusive means to resolve water shortages where senior users can be protected by other means. *Reynolds (1983)* did not address this issue and did not rule otherwise. *See Fernandez v. Farmers Ins. Co. of Ariz.*, 115 N.M. 622, 627, 857 P.2d 22, 27 (1993) (stating that cases are not authority for issues not decided). Further, the district court in the present case determined that Article IX of the Compact "is not invoked until New Mexico has failed to meet its delivery requirements," and that Article IX "does not mandate priority administration and curtailment of uses [as] the only option available to New Mexico." As a matter of contract construction, we agree. Thus, the more flexible approach pursued by the negotiating parties through the settlement agreement is

---

2. As well, although one Appellant raises the issue, neither Appellants nor Appellees cite authority as to whether Appellants can attack the constitutionality of the settlement agreement. We

will not, for that reason, address the issue. *See Smith v. Vill. of Ruidoso*, 1999–NMCA–151, ¶ 36, 128 N.M. 470, 994 P.2d 50.

not ruled out in the Constitution, the Compact, or case precedent.

{40} New Mexico's prior appropriation doctrine is like Colorado's prior appropriation doctrine, called the Colorado doctrine. *See Yeo,* 34 N.M. at 616, 286 P. at 972; *Snow v. Abalos,* 18 N.M. 681, 693, 140 P. 1044, 1048 (1914); *Albuquerque Land & Irrigation Co. v. Gutierrez,* 10 N.M. 177, 240, 61 P. 357, 361 (1900); *see also Empire Lodge Homeowners' Ass'n v. Moyer,* 39 P.3d 1139, 1146–55 (Colo. 2001) (en banc) (discussing Colorado's past and current prior appropriation system). Colorado legislation and cases are instructive on whether a state can look for reasonable alternatives to a priority call to resolve water shortages. Facing an over-appropriation of water that was causing issues similar to ours in New Mexico, the Colorado legislature in 1969 "chose to implement a policy of maximum flexibility that also protected the constitutional doctrine of prior appropriation." *Moyer,* 39 P.3d at 1150. The law authorized "water uses that, when decreed, are not subject to curtailment by priority administration," thus allowing "out-of-priority diversions for beneficial use that operate under the terms of decreed augmentation plans." *Id.* With augmentation, out-of-priority diversions would be allowed "while ensuring the protection of senior water rights." *Id.* (internal quotation marks and citation omitted). The legislation was intended to permit the administration of "diversions for beneficial use without curtailment." *Id.* at 1151, 1153. However, augmentation plans for substitute or replacement water could not result in material injury to senior appropriators. *See City of Aurora ex rel. Util. Enter. v. Colorado State Eng'r,* 105 P.3d 595, 615 (Colo.2005) (en banc) ("Whether an augmentation plan will result in material injury to senior appropriators is a factual determination based on the evidence presented in a particular case."); *Farmers Reservoir & Irrigation Co. v. Consol. Mut. Water Co.,* 33 P.3d 799, 811–12 (Colo.2001) (en banc) (stating that an applicant for a change of water right or an augmentation plan must establish the absence of injurious results to existing water rights from the proposed change or plan).

{41} Appellees assert that the Colorado legislation and cases point the way to what New Mexico can do and what, through Section 72–1–2.4, New Mexico has done. Appellants assert that the Colorado legislation and case law make it clear that "augmentation or replacement water schemes are possible only where the senior's right is satisfied," and that senior water users such as the New Mexico downstream, senior users must be protected. They are both right. The New Mexico compliance statute, Section 72–1–2.4, attempts to satisfy both needs. The purpose of the compliance statute is to both achieve compliance with the amended decree and satisfy the CID's senior water rights.

{42} The statute paves the way for public funding for the State to acquire land with appurtenant water rights or rights to the delivery of water. *See* § 72–1–2.4(B), (C), (D). It further authorizes "other appropriate actions that would effectively aid New Mexico in compliance with the ... amended decree." § 72–1–2.4(B). To comply with the Compact and the amended decree, the Stream Commission "is to purchase, and retire and place in a state water conservation program administered by the [Stream Commission], adequate water rights ... to increase the flow of water in the Pecos River and diminish the impact of man-made depletions of the stream flow." NMSA 1978, § 72–1–2.2(A), (D) (1991). The Stream Commission must enter into contracts with the CID, the PVACD, and the FSID before spending funds to implement the conservation program. *See* § 72–1–2.4(C).

{43} The settlement agreement follows through as a comprehensive contractual water resource management program involving land and water rights purchases, and including development of one or more well fields or the lease or purchase of existing wells to use as augmentation wells for the purpose of pumping water to the Pecos River to augment its flow. The settlement agreement contains specific targeted amounts of water to supply and deliver to the Pecos River and covers the supply for delivery to CID members after supply for delivery to the state line is met in conformity with Section 72–1–2.4(A). The settlement agreement resolves

what the parties refer to as the offer phase of the Pecos River adjudication, and covers procedures for what the parties refer to as the remaining CID-related membership surface water rights adjudication phase. The agreement was reached among the governmental entities charged with responsibilities to administer and protect the valuable water resource provided by the Pecos River and its stream system. Importantly, the settlement agreement does not rule out a priority call if needed to deliver the adjudicated acre-feet requirement to be delivered annually for the CID.

{44} The settlement decree accepts and adopts the settlement agreement and "judicially establishes the maximum allowable annual diversion and storage rights of the United States and the CID, and the CID's right to deliver water for the members of the CID." The settlement decree states that each individual CID member's surface water rights, which are still to be determined in the membership phase of the proceedings, are "limited by the diversion, storage, and delivery rights held by the United States and the CID." The settlement decree sets out the diversion, impoundment, and storage rights of the United States and the CID. Thus, the compliance statute and the settlement agreement and decree combine in an effort to protect senior water rights while also attempting to assure state line delivery compliance.

{45} Tracy/Eddy nevertheless assert that the legislation in Colorado allowed out-of-priority diversions under plans that would provide a substitute supply of water to fully satisfy downstream, senior users, whereas in the present case the settlement agreement curtails full satisfaction of downstream, senior users by waiving or blocking priority enforcement for CID members. Their point is that any water adjudication in the present case necessarily had to provide for full satisfaction of CID members. In particular, they argue that the storage requirements in the settlement agreement and decree of 50,000 acre feet "cannot guarantee a full demand of 3 [acre feet] delivered on the land for 25,055 acres of irrigated lands," and that other factors, including "production caps" and priority for Texas users in times of shortage, combine to ensure that CID members will continue to suffer the same shortages as in the past. Thus, they contend they will have to continue augmenting their water from groundwater that is more saline and costly than surface water.

{46} Tracy/Eddy's positions are problematic. The settlement agreement and decree, to which the United States, the State, the CID, and the PVACD are parties and proponents, settle the offer phase of the water rights adjudication as to the CID's diversion, storage, and delivery rights in regard to Pecos River surface water. Priorities have been afforded to Texas and to the CID and therefore to its members, although not at the expense of upstream, junior groundwater users as Tracy/Eddy have wanted and demanded. The settlement decree serves as an adjudication of the CID's surface water rights. The CID agreed to that adjudication and to the manner of administration and management of waters as set out in the decree.

■ {47} As an irrigation district, the CID's board can "act as it, in the exercise of its discretion and judgment, believes best for all members of the [CID]." *Brantley Farms v. Carlsbad Irrigation Dist.,* 1998–NMCA–023, ¶ 23, 124 N.M. 698, 954 P.2d 763. Although Tracy/Eddy demand a priority call to shut down junior users until senior users' water entitlements are assured and satisfied, they nowhere provide authority stating that individual CID members are authorized to request and obtain such priority enforcement. Nor have they attacked the authority of the CID to enter into the settlement agreement and approve the settlement decree on behalf of the CID members. The fact of the matter is that the negotiating parties, including the CID, proposed an adjudication, the district court adopted the proposed adjudication, the district court adjudicated the water rights of the CID, and the CID agreed to that adjudication. Tracy/Eddy are bound by that adjudication, and are in no position to argue that the adjudication shorts the CID on water rights.

### 3. Conclusion

{48} We hold that the settlement agreement and decree do not violate Article XVI, Section 2 of the New Mexico Constitution or Article IX of the Compact.

### B. N.M. CONST. ART. IX, § 14, AND ITS APPLICATION

■ {49} The "anti-donation clause" in Article IX, Section 14 of the New Mexico Constitution forbids the State to "directly or indirectly lend or pledge its credit, or make any donation to or in aid of any person, association or public or private corporation[.]" Our Supreme Court has defined "donation" in Article IX, Section 14 as "a gift, an allocation or appropriation of something of value, without consideration to a person, association or public or private corporation." *Vill. of Deming v. Hosdreg Co.*, 62 N.M. 18, 28, 303 P.2d 920, 926–27 (1956) (internal quotation marks omitted). Any "aid to private enterprise" must have the character of a donation "in substance and effect" in order to violate the anti-donation clause. *See id.* at 28, 303 P.2d at 927 (internal quotation marks omitted). Consideration for the allocation can be a defining element. *See Treloar v. County of Chaves*, 2001–NMCA–074, ¶ 32, 130 N.M. 794, 32 P.3d 803 (holding that because "severance pay is deemed to be in the nature of wages that have been earned," such pay was in return for consideration and not in violation of the anti-donation clause); *see also Battaglini v. Town of Red River*, 100 N.M. 287, 289–90, 669 P.2d 1082, 1084–85 (1983) (holding that anti-donation clause was not violated where compensation paid to sign owners for removal of their signs was "just compensation" in that sign owners at the time had no duty to remove their signs).

■ {50} Appellants argue that the State is violating the anti-donation clause because the substitution of public funds for enforcement of priorities, in order to avoid creating financial difficulties for the upstream, junior pumpers constitutes the appropriation of public funds for private benefit. Appellants assert that relieving private persons and entities of their obligations to submit to priority administration and shut down pumping "is simply an unconstitutional 'donation' of

[s]tate funds to juniors . . . who are now being richly rewarded . . . for their . . . efforts to thwart priority enforcement." Appellants support this contention with the further argument that the purchase of junior water rights does not give the State value for every dollar spent because the State pays full market value for junior rights that would have no market value were priority to be called against them as New Mexico law requires. *See White v. Bd. of Educ. of Silver City*, 42 N.M. 94, 105, 75 P.2d 712, 719 (1938) (expressing that municipal school district's issuance of bonds to construct a state school and giving funds from the sale of the bonds to the state school would "get value received for every dollar put into the enterprise"). Appellants see the negotiating parties' collaboration as nothing more than a pay-off that saves wealthy and influential upstream farmers who have benefitted from relatively cheap water supplies from the consequences of prior appropriation enforcement. This is not the case because the State receives present value for its purchase, even though subsequent circumstance may diminish the value.

{51} Appellants analogize this case to *State ex rel. Mechem v. Hannah*, 63 N.M. 110, 314 P.2d 714 (1957). In *Hannah*, the State passed an appropriation to give vouchers to ranchers in a drought condition so that they could maintain livestock for breeding purposes. *Id.* at 111–12, 314 P.2d at 715–16. *Hannah* is easily distinguished from the case at hand, however, because in *Hannah* the vouchers were a gift and the State received no consideration in return for the vouchers. In the case at hand, on the face of the transactions the State is purchasing land and water rights at market value, thus receiving valuable consideration for its expenditure of funds. We note, too, that the State also benefits because the purchases are made in the context of the settlement of a lawsuit that has stretched on for thirty years, and also that the State will be able to more quickly meet its obligations to Texas under the Compact. As such, we believe that the State will be receiving valuable consideration for its purchase of the land and water rights as contemplated by the settlement agreement.

While Appellants argue that if there were a priority call the water rights would be worthless, priority calls are not contemplated or required as long as the required minimum amount of water is supplied. We need not speculate on value, however, because unless and until the priority call is made, junior appropriators can continue to use the water. To the extent Appellants suggest that the State is receiving some lesser value for what it is paying, Appellants are simply suggesting that an issue of fact exists in regard to consideration. Appellants have not, however, attacked the provision allowing purchases on the ground that there exists a genuine issue of material fact that precludes summary judgment.

{52} Accordingly, we hold that Appellants have not proven that the settlement agreement and decree violate the anti-donation clause in Article IX, Section 14 of the New Mexico Constitution.

## C. THE COURT'S POWER TO ENTER THE SETTLEMENT DECREE

{53} Appellants contend that nothing in New Mexico's statutes and case law authorizes the district court to order, as a part of its water rights adjudication process, a program to spend public money as the court has done pursuant to the settlement agreement and decree. Appellants construct this contention based on the following arguments.

{54} According to Appellants, the settlement agreement "overruled" New Mexico case law by its dismissal of priority enforcement as unsuitable for use on the Pecos River and by proceeding on the methodologies and predictions advanced by Appellees pursuant to which water shortages will hopefully be remedied not by priority appropriation but by expenditure of public money to buy and transfer water rights and construct augmentation wells. Appellants argue that the settlement agreement means that "except in the unlikeliest of cases priority enforcement [in the present case] will never be possible," and that the approval of the settlement agreement and entry of the settlement decree repudiates prior appropriation law as applied in *Reynolds (1983)*. Appellants further argue that the type of discretionary remedial decision exercised by the district court more properly belongs in either the executive or legislative branch of government, since the New Mexico Constitution, Compact Article IX, and the adjudication statutes as applied in *Reynolds (1983)* intend adjudication authority to involve priority administration in adjudicating water rights.

{55} Appellants point particularly to New Mexico's adjudication legislation, originating in 1907 N.M. Laws ch. 49, § 21 that placed exclusive jurisdiction to adjudicate water rights in the courts. *See Lewis,* 84 N.M. at 772, 508 P.2d at 581 ("We note that, under our laws, only the courts are given the power and authority to adjudicate water rights."); NMSA 1978, § 72-4-17 (1965) (providing that the court "shall have exclusive jurisdiction to hear and determine all questions necessary for the adjudication of all water rights within the stream system"). Appellants assert that the court's adjudication power is set out in, and limited by, Sections 72-4-15, and -17 through -19, characterizing these statutes as setting out the "scheme" of the adjudication process approved by the New Mexico Supreme Court in *State ex rel. Reynolds v. Sharp,* 66 N.M. 192, 193-97, 344 P.2d 943, 944-46 (1959). Part of this scheme, Appellants continue, involves the requirement that court decrees of final adjudication of water rights be filed with the State Engineer, and thereafter be enforced by the State Engineer according to priorities, as necessary. *See* § 72-4-19. Our Supreme Court, Appellants say, has authorized district courts to order junior appropriators "to show cause in individual proceedings why their uses should not be enjoined" so as not to impair downstream, senior rights. *Reynolds (1983),* 99 N.M. at 700-02, 663 P.2d at 359-61.

{56} Appellants provide no case law limiting the district court's broad adjudication authority in the manner Appellants seek. We reject Appellants' arguments that our Supreme Court's approval of the statutory adjudication process and its validation of the use of priority enforcement in *Reynolds (1983)* somehow translates into a limitation on the adjudication authority exercised by the district court in the present case. Nor do we see any basis on which to hold that the

settlement agreement and decree are inconsistent with or precluded by the authority granted the district court in Sections 72–4–15 through –19.

{57} The district court has authority "to hear and determine all questions necessary for the adjudication of all water rights within the stream system involved." § 72–4–17. Section 72–4–19 refers to adjudicating priorities. We do not, however, view Sections 72–4–15 through –19 or any part of the adjudication statutes to either deny or to be inconsistent with the authority of the district court to adjudicate water rights as has occurred through the settlement agreement and decree. *Cf. State ex rel. State Eng'r v. Crider,* 78 N.M. 312, 431 P.2d 45 (1967) (upholding adjudication of water rights to municipalities for future use even though such water had not yet been put to beneficial use and no statute authorized such future use). This view is supported by the Legislature's enactment of Section 72–1–2.4. By enacting Section 72–1–2.4, the Legislature has shown an intent that the water resource management approach, as implemented in this case, is consistent with the concept in Section 72–4–19 that final decrees are to declare, "as to the water right adjudged to each party, the priority, amount, purpose, periods and place of use . . . together with such other conditions as may be necessary to define the right and its priority." The language in Section 72–4–19 indicates authority for the district court to act as it did in the present case, namely, to approve a settlement agreement and enter a decree necessary to define rights and priorities.

{58} That the Legislature intended such authority is made even more clear when one looks at NMSA 1978, § 72–2–9.1 (2003). *See Kilmer v. Goodwin,* 2004–NMCA–122, ¶ 19, 136 N.M. 440, 99 P.3d 690 (noting that a subsequent change to a statute supported its interpretation). In Section 72–2–9.1, the Legislature expressly provided, under the title of "priority administration," for the State Engineer to address in certain specified ways the urgent need for water administration outside of the adjudication process. However, this authority was limited—it was not to "affect the partial final decree and settlement

agreement as may be entered in the [CID] project offer phase of [the *Lewis* case presently before this Court]." § 72–2–9.1(A)–(D); *cf. Reynolds (1983),* 99 N.M. at 701, 663 P.2d at 360 ("Where a procedure that was not required or prohibited by statute was challenged, this Court has previously held that such procedure could be adopted by the state engineer because it was in substantial compliance with the requirements of the adjudication statutes, and a reasonable and practical way to accomplish the desired purposes." (internal quotation marks and citation omitted)).

{59} We hold that the district court did not exceed its authority or power to approve the settlement agreement and enter the settlement decree.

## D. GENUINE ISSUE OF MATERIAL FACT

■ {60} In opposing summary judgment, Appellants argued that certain facts presented by Appellees to prove that the settlement agreement would be effective to solve water shortage problems were disputed. More particularly, Appellants argued that the entire premise of the settlement agreement, namely, that a priority call would be impractical, too costly, and ineffective, was faulty because this assumption overlooks flexible ways to enforce priority and excuses the negotiating parties' failure to make a good faith effort to apply priority enforcement. In addition, Appellants also disputed the reliability and predicted results of the "model suite" for resource administration that the negotiating parties used as an integral part of their settlement. Appellants' ultimate goal was to show that genuine issues of material fact existed as to whether the settlement agreement would benefit them, asserting that, to the contrary, the settlement agreement would harm them in that they would continue to be plagued with water shortages.

{61} The district court framed the issue before it as whether the settlement agreement and decree would adversely affect the value of Appellants' water rights. The court rejected Appellants' position, holding it to be an invalid objection to the settlement agree-

ment. The court reasoned that other remedies were available to Appellants to protect against the adverse effect of which they complained. Further, the court held that Appellants did not specifically controvert any of the material facts on which the court was basing its grant of summary judgment.

{62} What Appellants sought to prove in a hearing on the merits was that implementation of the settlement agreement would not rectify continuing harm to Appellants. In Appellants' eyes, this proof would have been material evidence for the district court's determination whether to approve the settlement agreement and enter the proposed settlement decree. We assume, without deciding, that issues of fact exist. The issue is whether the disputed issues were *genuine* issues of *material* fact as to Appellants' claim of harm.

{63} It is important at the outset to reiterate the posture of the case leading in to summary judgment. The settlement agreement was the outcome of the negotiating parties' attempt to implement the compliance statute. Thus, the district court was presented with a settlement of the parties to the adjudication proceeding. The court nevertheless gave non-parties an opportunity to object to the settlement agreement and proposed decree. The ultimate questions for the court were whether the court should approve and adopt the settlement agreement as the court's adjudication of water rights in the offer phase of the litigation and reject Appellants' objections.

{64} The court presumably could have rejected the settlement agreement if it unfairly and adversely affected the water rights of third parties who were allowed to object to it. *Cf. In re Masters Mates & Pilots Pension Plan and IRAP Litig.*, 957 F.2d 1020, 1026 (2d Cir.1992) (stating, in a class action settlement, that where third parties are concerned a proposed class action settlement must be reviewed not only for its fairness, reasonableness, and adequacy, but also whether a decree approving the settlement will be inequitable because it will harm third parties unjustly); *Manual for Complex Litigation* (Fourth) § 13.14 (2004) (stating, as to review and approval of settlements under the

Federal Rules of Civil Procedure where a settlement affects the rights of non-parties or non-settling parties or where a settlement is signed by a party acting in a representative capacity, that "in general the judge is required to scrutinize the proposed settlement to ensure that it is fair to the persons whose interests the court is to protect"). The challenge Appellants present is that there exists a genuine issue of material fact as to whether Appellants will be unjustly harmed by not receiving the amount of water to which they are entitled. For the reasons that follow, we determine this question against Appellants.

{65} First, we have already determined that the settlement agreement and decree are not invalid for having placed a priority call in reserve. Also, Appellants have never contended that a genuine issue of material fact existed in relation to the legal validity of the settlement agreement or the settlement decree. Thus, even were the settlement agreement premised on the impracticability or cost or ineffectiveness of a priority call, as Appellants contend, this does not present a genuine issue of material fact that can defeat summary judgment.

{66} Second, as we discussed earlier in this opinion, the CID agreed to the settlement agreement and decree and thus to the adjudication of the amount of water the CID had a right to divert for storage and distribution to CID members. Tracy/Eddy have not attacked the CID's authority to agree to the adjudication and to bind the CID's members to the adjudication. Tracy/Eddy, therefore, are saddled with adjudication of water to the CID contained in the settlement agreement and decree to which the CID agreed, relegating Tracy/Eddy to attacking in later proceedings any percentage or acreage mis-allocation to which they claim entitlement as a member of the CID.

{67} It appears, nevertheless, that Tracy/Eddy in effect assert that the settlement decree adjudication is invalid because it conflicts with the earlier Hope decree adjudication of the CID's water rights, that it is the earlier adjudication that marks the CID's water rights, and that Tracy/Eddy are harmed because the present adjudication does not provide sufficient water to fully

satisfy the CID's entitlement. This argument was not clear from any of Appellants' briefs; it became clearer in oral argument.

{68} In the background section of their brief in chief on appeal, Appellants simply mention in a footnote that CID members have a permitted and licensed annual reservoir storage right of 176,000 acre feet, and that the 50,000 minimum in the settlement agreement and decree, being the only assured supply in the settlement decree, is far too little to satisfy their "full decreed" right of three acre feet per year for each of 25,055 acres. In the same footnote, Tracy/Eddy conclude that "[t]hus, the Settlement Agreement, based on waiver of priority enforcement by and for CID farmers, allows, indeed ensures, that serious surface water shortages for CID will continue into the future." Elsewhere, Tracy/Eddy state that CID's surface water rights were "decreed 1887 rights," having been decreed in the Hope decree. However, nowhere in their briefs do Tracy/Eddy explain how and why the CID or they have an adjudicated, decreed water right that is superior to or different than that adjudicated for the CID in the settlement decree in the present case, or how or why the CID's adjudicated right in the present case is not controlling as the effective adjudication of the CID's water rights.

{69} Presumably because they discerned no separate issue having been raised by Appellants, in their answer briefs on appeal Appellees make no mention of the specific difference between the earlier and present adjudications. Nor do they respond to Tracy/Eddy's footnote. In addressing the Hope decree, the PVACD does state that any adjudication of the rights of the CID was not binding upon those who were not parties or privity, which would include the State, the PVACD, and the upstream, junior users in the Roswell Artesian Basin.

{70} In oral argument, this Court raised the issue of proof of harm to Appellants, including the question of the adequacy of the 50,000 acre feet minimum set out in the settlement agreement and decree. Appellants' counsel stated that the settlement decree does not dispute the "176,000 acre feet maximum carryover storage and 3 acre feet per acre for 25,055 acres," and that the numbers were taken from a PVACD expert's materials and represented "a full supply [of water] for the farmers of the CID." Counsel for Tracy/Eddy also stated that "the only thing that matters in terms of the waiver of priority enforcement is they keep this facially inadequate 50,000 acre feet in there as of March 1, [and] the poor individual farmers are stuck with the situation, and this is what constitutes the harm, the adverse effect I was talking about."

{71} As expected, counsel for the PVACD took a position in oral argument contrary to Appellants' position, stating that the Hope decree was not binding on the parties in the present litigation who were not parties in the *Hope* proceeding; that there existed no decree of the CID senior rights as of the time of the settlement agreement in the present case, but only an earlier decree of senior rights to be adjudicated in the future; that the present case became that anticipated future adjudication of the CID's rights to divert, store, and distribute; and that the CID had authority to negotiate and agree to the settlement on behalf of the members of the CID. Thus, according to the PVACD, Tracy/Eddy presented no facts in regard to harm or impairment that created a genuine issue of material fact. Counsel for the CID also disputed Tracy/Eddy's contention that the CID had decreed rights from the time of the Hope decree that defined and controlled the CID's water rights.

{72} We agree with Appellees that, to the extent Tracy/Eddy claim that they are harmed by the settlement decree's adjudication of the storage and distribution rights of the CID, Tracy/Eddy failed to present any genuine issue of material fact as to harm. The Hope decree was not binding on the State or the PVACD, and it is not an adjudication with respect to the CID that precluded the adjudication in the present case. Tracy/Eddy present no authority to the contrary. Furthermore, the lack of a genuine issue of material fact is demonstrated, as we have indicated earlier in this opinion, by the fact that the CID members, including Tracy/Eddy, are bound by the adjudication in the settlement decree of the CID's storage

and distribution rights. Thus, Tracy/Eddy cannot measure harm by what may have been adjudicated in the Hope decree. As far as we can determine, they can only measure harm, if at all, by how they fare in the membership phase or any other phases of this litigation relating to their entitlement as a CID member.

{73} It appears that Tracy/Eddy may have fallen victim to the inability or failure of the State and the irrigation entities over many years to complete an adjudication of the Pecos River surface and groundwater rights. They have sought their day in court to show through factual development that the new adjudication contained in the settlement decree will accomplish nothing more than continuing the same water shortages that they believe they have suffered for many years. But they have not made a prima facie case that the CID's water rights or that individual water rights would be or have been adversely affected by the settlement agreement and decree. Nor have they shown, and perhaps it was illusory to think that they could show, that a genuine issue of material fact exists regarding unjust harm to the CID or CID members.

{74} Last, specifically as to Hope, we do not find anywhere in Appellants' briefs any evidence, discussion, or authority specific to Hope as to how Hope has been harmed and what genuine issues of material fact exist as to any such harm. We therefore decline to address the issue. A party that fails to present argument or authority to support a contention runs a very substantial risk that this Court will not address the contention, either because of the failure of argument or authority, or because the party is deemed to have abandoned the contention. *See In re Adoption of Doe*, 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984) (holding that a party must submit argument and authority in order to present an issue for review on appeal); *Murken v. Solv–Ex Corp.*, 2006–NMCA–064, ¶ 6, 139 N.M. 625, 136 P.3d 1035 (stating that this Court will not address contentions not supported by argument and authority); *In re Candice Y.*, 2000–NMCA–035, ¶ 19, 128 N.M. 813, 999 P.2d 1045 (holding an issue abandoned upon failure to present argument or authority).

{75} We hold that Appellants have failed to show any genuine issue of material fact that would preclude entry of summary judgment.

**CONCLUSION**

{76} We affirm the district court's judgments in favor of Appellees and against Appellants.

{77} **IT IS SO ORDERED.**

WE CONCUR: CELIA FOY CASTILLO and RODERICK T. KENNEDY, Judges.