Certiorari Denied, October 27, 2016, S-1-SC-36107

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2016-NMCA-101**

**Filing Date:  August 31, 2016**

**Docket No. 34,345**

**COULTON QUEVEDO, by and through his
Attorney-in-Fact (with power of attorney), AIMEE
BEVAN; BARBARA GUILFOYLE, individually;
SUSAN WECKESSER, as Conservator for RYAN
MORGAN; CHERYL MORGAN, individually;
JORDAN ALMANZA, individually; and MARC
FLEMING, individually,**

       **Plaintiffs-Appellants,**

**v.**

**NEW MEXICO CHILDREN, YOUTH & FAMILIES
DEPARTMENT, NEW MEXICO LICENSING AND
CERTIFICATION AUTHORITY, a division of the
NEW MEXICO COMMUNITY OUTREACH AND
BEHAVIORAL HEALTH PROGRAMS, and NEW
MEXICO DEPARTMENT OF WORKFORCE
SOLUTIONS,**

       **Defendants-Appellees.**

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Francis J. Mathew, District Judge**

McGinn, Carpenter, Montoya & Love, PA
Randi McGinn
A. Elicia Montoya
Michael E. Sievers
Albuquerque, NM

for Appellants

Law Office of Michael Dickman

Michael Dickman
Santa Fe, NM

for Appellees

**OPINION**

**BUSTAMANTE, Judge.**

**{1}** Plaintiffs appeal the grant of summary judgment in favor of the Children, Youth, and Families Department (CYFD) on the ground that CYFD was immune from suit under the New Mexico Tort Claims Act. We conclude that questions of material fact preclude summary judgment and reverse.

**BACKGROUND**

**{2}** Tierra Blanca Ranch High Country Youth Program (TBR) is a private, for-profit business in New Mexico that provides troubled adolescent residents with schooling, counseling, and therapy. CYFD is a cabinet-level department of the state government. NMSA 1978, §§ 9-2A-1 to -24 (1992, as amended through 2011).

**{3}** Plaintiffs Quevedo, Morgan, Almanza, and Fleming, together with the other plaintiffs (collectively, Plaintiffs), filed a multi-count complaint in 2013 against CYFD[1] and TBR alleging that while they were participants in TBR's program, they were physically and emotionally abused by TBR staff and other participants. Some also allege that they were deprived of adequate food, denied access to their families, shackled, and forced to perform extreme exercise. Plaintiffs further allege that CYFD knew of abusive practices at TBR, that TBR was not licensed pursuant to statute and CYFD regulations governing licensing of "multi-service homes" and "community homes," and that CYFD negligently failed to license and regulate TBR. They point to the fact that, in 2005, CYFD initiated the licensing process

---

[1]Plaintiffs' complaint also named the Department of Workforce Solutions (DWS), a cabinet-level department of the state. NMSA 1978, § 9-26-4 (2007). The district court granted summary judgment "in favor of the [s]tate [d]efendants," including both CYFD (and its Licensing and Certification Authority) and DWS. While on appeal Plaintiffs state that they appeal the grant of summary judgment in its entirety, they posit no arguments related to DWS's duties to them nor do they cite to any statutes or regulations defining DWS's obligations vis á vis TBR. We therefore consider Plaintiffs' appeal of the grant of summary judgment to DWS abandoned. *See State ex rel. Office of State Eng'r v. Lewis*, 2007-NMCA-008, ¶ 74, 141 N.M. 1, 150 P.3d 375 ("A party that fails to present argument or authority to support a contention runs a very substantial risk that this Court will not address the contention, either because of the failure of argument or authority, or because the party is deemed to have abandoned the contention.").

with TBR. CYFD subsequently stated in a 2006 letter to TBR that it "ha[d] determined that TBR is a multi[-]service home under [S]ection 7.8.3.10(B) [NMAC] of the Shelter Care Regulations" and that "TBR must have a license to continue in operation." However, CYFD eventually ceased its efforts to license TBR. CYFD maintains that "the applicable New Mexico statutes [do not] allow[] or require[] CYFD to license TBR[]."

**{4}** Instead of answering the complaint, CYFD filed a motion for summary judgment on the ground that the so-called "building waiver" in NMSA 1978, Section 41-4-6(A) (2007) of the New Mexico Tort Claims Act (the TCA) does not waive immunity for Plaintiffs' claims. *See* NMSA 1978, §§ 41-4-1 to -30 (1976, as amended through 2015); Rule 1-056 NMRA. After a hearing on the motion for summary judgment, the district court granted the motion. Plaintiffs appeal. Additional facts are included as pertinent to our discussion of Plaintiffs' arguments.

**DISCUSSION**

**{5}** "Summary judgment is proper if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Callaway v. N.M. Dep't of Corr.*, 1994-NMCA-049, ¶ 2, 117 N.M. 637, 875 P.2d 393 (internal quotation marks and citation omitted). "However, summary judgment should not be used as a substitute for trial on the merits so long as one issue of material fact is present in the case." *Id.* "In addition, when the facts are insufficiently developed or further factual resolution is essential for determination of the central legal issues involved, summary judgment is not appropriate." *Id.* "An issue of fact is 'material' if the existence (or non-existence) of the fact is of consequence under the substantive rules of law governing the parties' dispute." *Martin v. Franklin Capital Corp.*, 2008-NMCA-152, ¶ 6, 145 N.M. 179, 195 P.3d 24. Our review of summary judgment is de novo. *Farmington Police Officers Ass'n v. City of Farmington*, 2006-NMCA-077, ¶ 13, 139 N.M. 750, 137 P.3d 1204.

**{6}** Here, the relevant substantive law is the TCA, which "grant[s] governmental entities and employees a general immunity from tort liability, but . . . waive[s] that immunity in certain defined circumstances." *Cobos v. Doña Ana Cty. Hous. Auth.*, 1998-NMSC-049, ¶ 6, 126 N.M. 418, 970 P.2d 1143; *see* § 41-4-4(A). "In each of these waivers the Legislature identified a specific existing duty on the part of public employees, . . . which, if breached, could result in liability 'based upon the traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty.' " *Cobos*, 1998-NMSC-049, ¶ 6 (quoting Section 41-4-2(B)).

**{7}** "The 'building waiver' waives governmental immunity for damages caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment[,] or furnishings." *Id.* ¶ 7 (internal quotation marks and citation omitted); *see* § 41-4-6. In *Cobos*, the Court held that the building waiver is not limited to public buildings, stating that "[t]he Legislature defined 'scope of duties' to mean 'any duties that a public employee is requested, required,

3

or authorized to perform . . . *regardless of the time and place of performance.*' " *Cobos*, 1998-NMSC-049, ¶ 8 (omission in original) (quoting Section 41-4-3(G)). "Accordingly, the 'building waiver' in Section 41-4-6 on its face excepts immunity for the negligent operation or maintenance of *any* building by a public employee acting within the scope of duty." *Cobos*, 1998-NMSC-049, ¶ 8.

**{8}** Moreover, "the waiver is not limited to injuries resulting from a physical defect on the premises." *Encinias v. Whitener Law Firm, P.A.*, 2013-NMSC-045, ¶ 10, 310 P.3d 611. "Instead, we interpret Section 41-4-6(A) broadly to waive immunity where due to the alleged negligence of public employees an injury arises from an unsafe, dangerous, or defective condition on property owned and operated by the government." *Encinias*, 2013-NMSC-045, ¶ 10 (internal quotation marks and citation omitted). "The waiver applies to more than the operation or maintenance of the physical aspects of the building, and includes safety policies necessary to protect the people who use the building." *Upton v. Clovis Mun. Sch. Dist.*, 2006-NMSC-040, ¶ 9, 140 N.M. 205, 141 P.3d 1259.

**A.     The "Building Waiver" Permits Suit When There Is a Duty of Care Created by a Relationship Between the Parties**

**{9}** Case law indicates that the relationship between a governmental entity and a person can influence whether the building waiver applies in a given circumstance. Two cases are particularly instructive. In *Cobos*, the plaintiff sued the Doña Ana County Housing Authority (Housing Authority) for the wrongful death of her daughter and granddaughters as a result of a fire. 1998-NMSC-049, ¶ 4. The plaintiff and her family "were participants in a federally[]subsidized low-income housing program administered by the . . . Housing Authority. Their home was privately owned and rented to them through the [Housing] Authority's Section 8 Existing Housing Program." *Id.* ¶ 2. The Housing Authority argued that the building waiver did not apply to permit suit against it because it did not have a sufficient legal interest in the home, which was owned by a private individual. *Id.* ¶ 4. The Court of Appeals affirmed the dismissal of the complaint on immunity grounds and because the Housing Authority had not received the required notice under the TCA. *Id.* ¶¶ 4-5.

**{10}** The Supreme Court granted certiorari to address only "whether [the p]laintiff [had] stated a claim under the building waiver based on the duties of the public employees who appear as individual defendants in [that] case." *Id.* ¶ 5. It held first that "the effect of the [building] waiver should not be determined by the legal status of or the title to the real property, but should instead be determined by an examination of the public employees' duties." *Id.* ¶ 7. It next observed that "statutes, regulations, and contracts [are] sources of duties of ordinary care imposed on public employees that may bring them within a [TCA] waiver[,]" *id.* ¶ 12, and made a detailed examination of statutes and regulations governing the Housing Authority. *Id.* ¶¶ 13-14. The Municipal Housing Law authorized the Housing Authority to "construct, maintain, operate[,] and manage any housing project[,]" which was defined as "any work or undertaking of the county to provide decent, safe, and sanitary dwellings . . . for persons of low income." *Id.* ¶ 13 (omission in original) (emphasis, internal

4

quotation marks, and citations omitted). It also required compliance with federal regulations connected with funding through the federal Section 8 Existing Housing Program. *Id.* ¶ 14. Through the program, "the [Housing] Authority screens for and certifies a qualified needy participant, and represents that it will subsidize the participant's rental of approved homes to an extent that is prorated by income, need, and family size. The [Housing] Authority then contracts with the owner of the property to provide rental housing for the participant." *Id.* This arrangement "create[d] a relationship among the [Housing] Authority, the private landowners, and the family in need." *Id.* In addition, federal regulations required the Housing Authority to inspect the home before leasing it and annually thereafter and gave the Housing Authority the right to terminate the contract with the owner if the owner failed to maintain the home to certain standards. *Id.* The Court concluded that "[u]nder the state law and the federal regulations, the [Housing] Authority exercised at least some control over the quality of the private housing by inspecting and selecting the proper dwelling and by providing in its contract with the owners a large degree of control over the building." *Id.* It concluded that "the relationships of the actors . . . imposed at least limited duties of operation or maintenance on [Housing] Authority employees" such that the plaintiff's claim could proceed under the building waiver provision of the TCA. *Id.* ¶ 18.

**{11}**     In reaching this conclusion, the Court rejected the Housing Authority's argument that its relationship with the home and owner was "one of mere regulation and inspection of private property[,]" *id.* ¶ 15, or the result of a "general regulatory relationship between the government and its citizens." *Id.* ¶ 16. The Court stated that

> [t]he Legislature created the Authority for the purposes of operating and maintaining housing projects in a decent, safe[,] and sanitary condition. The Housing Authority . . . chose to do so by using private property in the manner prescribed by the federal regulations. Thus, the privately[]owned home was substituted for publicly[]owned low-income housing . . . , [and the Housing Authority's] duties under the Municipal Housing Law and Existing Housing Program went far beyond a mere duty to inspect and regulate private conduct.

*Id.* ¶ 15; *see id.* ¶ 16 (stating that the Housing Authority's "voluntary undertaking to effectuate the policies in [the Municipal Housing Law] by providing [the p]laintiff's family with safe housing they could not otherwise obtain" and stating that [t]his undertaking gives rise to a more specific relationship among the parties than does general regulation for the public good").

**{12}**     In *Young v. Van Duyne*, this Court considered whether the building waiver could apply to permit suit against CYFD based on CYFD's failure to inform the plaintiff's family that the child they fostered and later adopted had violent tendencies. 2004-NMCA-074, ¶ 3, 135 N.M. 695, 92 P.3d 1269. The child later killed the plaintiff's wife with a baseball bat. *Id.* This Court held that the plaintiff's claims survived a Rule 1-012(B)(6) NMRA motion to dismiss and that the plaintiff "must be permitted to proceed on the merits of his claim that CYFD operated the [plaintiff's] foster home within the meaning of the [building] waiver."

*Young*, 2004-NMCA-074, ¶¶ 17, 23. Its reasoning was based in part on the special concurrence in *M.D.R. v. State ex rel. Human Services Department*, in which Judge Minzner wrote that "[t]he placement of a child in foster care within a private home involves the state in the lives of its citizens in a unique way" because the statutes and regulations governing foster care required the state to maintain a degree of control over the child. 1992-NMCA-082, ¶ 17, 114 N.M. 187, 836 P.2d 106 (Minzner, J., specially concurring); *see Young*, 2004-NMCA-074, ¶ 20. Although the claims presented in *M.D.R.* were based on allegations that the state negligently placed a child in the plaintiffs' foster home, Judge Minzner observed that claims related to the day-to-day functioning of the foster home might have fallen within the "operation" prong of the building waiver. *M.D.R.*, 1992-NMCA-082, ¶ 21. Based on the special concurrence in *M.D.R.* and *Cobos*, the *Young* Court remanded to permit the plaintiff to "prove a regulatory scheme or conduct from which a fact[-]finder can conclude pre-adoption operation of the [plaintiff's] home as contemplated under [the building waiver]." *Young*, 2004-NMCA-074, ¶¶ 20-21, 35.

**{13}**     We recognize that, because of its procedural posture, *Young* is not dispositive of whether CYFD was "operating" foster homes so as to permit suit under the building waiver. Similarly, *Cobos* is not dispositive. Nevertheless, *Young* and *Cobos* together suggest that the building waiver may apply when an agency undertakes to provide housing for clients when permitted or required to do so under specific statutory authority. *Cobos*, 1998-NMSC-049, ¶ 16 (stating that the Housing Authority's "voluntary undertaking to effectuate the policies in [the Municipal Housing Law] . . . [gave] rise to a more specific relationship among the parties than does general regulation for the public good").

**B.     CYFD Owes a Duty of Ordinary Care to Children Under Its Jurisdiction**

**{14}**     As indicated in *Cobos*, CYFD's duty is imposed in a variety of statutes and regulations. *See id.* ¶ 12 ("Our appellate courts regularly look to statutes, regulations, and contracts as sources of duties of ordinary care imposed on public employees that may bring them within a [TCA] waiver."). For instance, the Children's Code establishes standards for the housing of children by CYFD. The Children's Shelter Care Act, the purpose of which is to "divert children out of the juvenile justice system," NMSA 1978, § 32A-9-2(B)(2) (1993), provides for the placement by CYFD of children alleged to be in need of supervision, children determined to be in need of supervision, or alleged delinquent children "in a community-based shelter-care facility." NMSA 1978, § 32A-9-6 (1993); *see* NMSA 1978, § 32A-9-3(B)-(D) (1993). Other parts of the Children's Code indicate that "community-based shelter-care facilities" include the home of a relative, a licensed foster home or group home, or "a facility operated by a licensed child welfare services agency[.]" NMSA 1978, § 32A-4-8 (1993); *see* NMSA 1978, § 32A-3B-6 (1993). Similarly, children alleged to be neglected or abused, or from a family in need of services, may be placed with a family member, or in a licensed foster home, facility operated by a licensed child welfare services agency, or a facility provided for in the Children's Shelter Care Act. Sections 32A-4-8, -3B-6. Placement of children alleged to be delinquent or youthful offenders is limited to a similar list of facilities. NMSA 1978, § 32A-2-12 (2009).

6

**{15}** In addition to these statutes governing where CYFD may place children, CYFD has promulgated extensive licensing requirements and regulations governing residential shelter-care facilities for children, including crisis shelters, multi-service homes, community homes, and "[n]ew or [i]nnovative programs" that provide children's services, as well as foster homes. 7.8.3.2 NMAC (09/15/1975, as amended through 08/15/2011) (licensing requirements for shelter-care homes); 8.26.4 NMAC (licensing requirements for foster and adoptive homes). The shelter-care regulations specify the records that must be kept for each child, licensing requirements for each facility, reporting requirements, and space and building requirements, as well as setting standards for medical care, nutrition, housekeeping, waste disposal, and seclusion rooms, among other things. 7.8.3.2 NMAC (12/23/1987, as amended through 05/15/2001). More relevant to Plaintiffs' claims, the regulations require facilities in which CYFD is permitted or required to place or refer children pursuant to statute or regulation to "support, protect, and enhance the rights of children" including "the right to receive visitors in private at reasonable times" and "the right to written and telephone access." 7.8.3.28 NMAC(B)(7), (8). The regulations also prohibit use of "unusual or unnecessary punishments including, but not limited to," physical exercise as a form of punishment, denial of food, water, or rest, denial of visiting or communication privileges, use of restraints, verbal abuse, and spanking, hitting, or "aggressive physical contact with a child." 7.8.3.80(F) NMAC. The regulations also include requirements for staffing levels and records, staff qualifications, staff training and evaluation, and staff health certificates and criminal background checks. 7.8.3.30 to .34 NMAC. Similarly, the statutes and regulations governing foster care, discussed in *M.D.R.*, provide for substantial oversight of foster homes and foster parents. 1992-NMCA-082, ¶ 17 (Minzner, J., specially concurring); *see* 8.26.4 NMAC. Both the shelter-care regulations and foster home regulations clearly address a wide variety of aspects of the day-to-day operation of the subject facilities.

**{16}** Even "community homes," which are excluded from particular regulations governing residential shelter-care facilities, *see* 7.8.3.2 NMAC, and "group homes" are required to "observe standards comparable to pertinent recognized state or national group home standards for the care of children[.]" NMSA 1978, § 9-8-13(B) (2007) (defining "group home" as "any home the principal function of which is to care for a group of children on a [24]-hour-a-day residential basis," which (1) "receives no funds as such directly from or through the department" and (2) "is a member of any state or national association that *requires it to observe standards comparable to pertinent recognized state or national group home standards for the care of children*" (emphasis added)); 8.26.6.7(D) NMAC (regulations governing community homes, defining a community home as "a facility which operates 24 hours a day and provides full time care, supervision[,] and support to no more than 16 children in a single residential building, and which meets the definition of 'group home' as outlined in . . . [Section] 9-8-13."); 7.8.3.2 NMAC (stating that community homes are subject to only some of the regulations in 7.8.3 NMAC).

**{17}** What we glean from these statutes and regulations is that CYFD has an obligation to house children in its care in homes or facilities that meet certain minimum health and

safety standards. This obligation may create a relationship between CYFD, the homes or facilities in which children are placed, and the children. *See Cobos*, 1998-NMSC-049, ¶ 14. We conclude that the waiver of immunity in Section 41-4-6(A) permits suit against CYFD when such a relationship exists.

**C.      Questions of Material Fact Preclude Summary Judgment**

**{18}**      We turn now to the immediate question presented by Plaintiffs' appeal. The question centers factually on whether and under what circumstances, children were sent or referred to TBR by CYFD, a question that raises a genuine issue of material fact, requiring reversal and remand. Once answered, the issue becomes a legal one, what duty of care, if any, CYFD owed to any particular child placed or referred to TBR by CYFD. Based on the facts and arguments on appeal, we construe Plaintiffs' assertions to go beyond a failure by CYFD to license and regulate TBR. Plaintiffs argue that CYFD "failed to operate and maintain TBR safely despite having a duty to do so." Plaintiffs' assertions can be read as being similar to those made at the motion to dismiss stage in *Cobos* and in Justice Minzner's scenario in *M.D.R.*, to include an assertion that CYFD failed to exercise ordinary care "to provide for the care, protection, and wholesome mental and physical development of children" under statutory or regulatory circumstances requiring CYFD to do so and to do so in a manner that could have prevented the alleged abuse of one or more children sent or referred to TBR by CYFD. To be explored in further discovery and proof are Plaintiffs' allegations and any evidence in the record in regard to whether, and if so to what extent, CYFD was involved in sending or referring children to TBR, and what duty existed, if any, to follow up on their well-being. Included within this analysis is the extent, if any, indicated by evidence in the record, to which CYFD's juvenile justice division may have received funds earmarked for TBR in 1999, and also the extent, if any, to which inferences can be drawn that TBR and CYFD had financial dealings then or at any other time. We note that, at the hearing on the motion, CYFD appeared to admit that CYFD had placed children at TBR. Since CYFD did not respond to Plaintiffs' allegations in writing and the admission was only in a passing comment, we decline to give this statement more import than is deserved. In spite of CYFD's statement, we conclude that the questions of whether and under what circumstances children were placed at TBR by CYFD present disputed material factual issues.[2]

**{19}**      In its pleadings related to the motion for summary judgment, CYFD did not respond

_____

[2]In support, Plaintiffs attached a copy of the general appropriations bill containing the earmark to TBR and a complaint filed by Scott and Colette Chandler, who own and operate TBR, in which the Chandlers asserted that "[o]ver the existence of the TBR Youth Program, TBR Youth Program has received youths from New Mexico [CYFD], referrals from juvenile justice and parole, the courts, as well as private placements." The Chandlers further stated that "[f]or enrollment in the TBR Youth program, Scott Chandler is contacted either by a program facilitator, a social worker, a . . . Juvenile Justice Police Officer [sic], therapist and/or a parent."

to Plaintiffs' assertions that CYFD sent children in its care to TBR or that CYFD has or had a financial arrangement with TBR. The district court did not set out the undisputed facts on which it relied in granting summary judgment.

**{20}** In reviewing a motion for summary judgment, the district court "must resolve all reasonable inferences in favor of the nonmovant and must view the pleadings, affidavits, depositions, answers to interrogatories and admissions in a light most favorable to a trial on the merits." *Garcia-Montoya v. N.M. Treasurer's Office*, 2001-NMSC-003, ¶ 7, 130 N.M. 25, 16 P.3d 1084. "Summary judgment is an extreme remedy that should be imposed with caution[,]" and is improper if the nonmovant demonstrates "a reasonable doubt as to the existence of a genuine factual issue." *Ocana v. Am. Furniture Co.*, 2004-NMSC-018, ¶¶ 12, 22, 135 N.M. 539, 91 P.3d 58 (internal quotation marks and citation omitted). Here, Plaintiffs' assertions raise a reasonable doubt as to the existence of material factual issues, to wit, whether CYFD placed children in its care at TBR.

**CONCLUSION**

**{21}** We conclude that questions of material fact preclude summary judgment on the issue of whether the TCA's building waiver applies to permit Plaintiffs' suit. We hold that summary judgment should have been denied. *See Espinoza v. Town of Taos*, 1995-NMSC-070, ¶ 5, 120 N.M. 680, 905 P.2d 718 ("Summary judgment is inappropriate when resolution of a factual dispute is required to determine a legal question before the [c]ourt."). We therefore reverse and remand for further proceedings.

**{22}** **IT IS SO ORDERED.**

_____

**MICHAEL D. BUSTAMANTE, Judge**

**I CONCUR:**

_____

**MICHAEL E. VIGIL, Chief Judge**

_____

**JONATHAN B. SUTIN, Judge**