# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: April 3, 2018

**NO. A-1-CA-33535**

**STATE OF NEW MEXICO ex rel.
STATE ENGINEER,**

  Plaintiff-Appellee,

**v.**

**UNITED STATES OF AMERICA,**

  Defendant-Appellee,

**v.**

**NAVAJO NATION,**

  Defendant/Intervenor-Appellee,

**v.**

**SAN JUAN AGRICULTURAL WATER USERS
ASSOCIATION, HAMMOND CONSERVANCY
DISTRICT, BLOOMFIELD IRRIGATION DISTRICT, and
VARIOUS DITCHES AND VARIOUS MEMBERS THEREOF,**

  Defendants-Appellants.

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY
Honorable James J. Wechsler**

Arianne Singer, Special Assistant Attorney General
Santa Fe, NM

Utton & Kery, P.A.
John W. Utton, Special Assistant Attorney General
Santa Fe, NM

for Appellee State of New Mexico, New Mexico Office of the State Engineer

United States Department of Justice Appellate Section
Environment & Natural Resources Division
John C. Cruden, Assistant Attorney General
Andrew J. Guarino
Mark R. Haag
Washington, D.C.

for Appellee United States of America

Navajo Nation Department of Justice
Stanley M. Pollack
M. Kathryn Hoover
Window Rock, AZ

for Intervenor-Appellee Navajo Nation

Victor R. Marshall & Associates, P.C.
Victor R. Marshall
Albuquerque, NM

for Appellants San Juan Agricultural Water Users, Hammond Conservancy District, Bloomfield Irrigation District, and Various Ditches and Various Members Thereof

Stein & Brockmann, P.A.
James C. Brockmann
Jay F. Stein
Santa Fe, NM

for Bernalillo County Water Utility Authority, City of Española, and City of Gallup

Keleher & McLeod, P.A.
Cassandra R. Malone
Richard B. Cole
Albuquerque, NM

for Cities of Aztec and Bloomfield

Tully Law Firm, P.A.
Richard T. C. Tully
Farmington, NM

for B Square Ranch; Bolack Minerals Company, a/k/a Bolack Minerals Company Limited Partnership; Estate of Tom Bolack; a/k/a Thomas Felix Bolack, Deceased; Bolack Minerals Foundation; Tommy Bolack Revocable Trust; Estate of Juanita Velasquez, Deceased; David A. Pierce; Maxine M. Pierce; David M. Drake; and Shawna Drake

Modrall Sperling Roehl Harris & Sisk, P.A.
Maria O'Brien
Christina C. Sheehan
Zoë E. Lees
Albuquerque, NM

for BHP Billiton New Mexico Coal Inc. and Enterprise Field Services, LLC

Dumas Law Office, LLC
Jenny Dumas
Albuquerque, NM

for Jicarilla Apache Nation

Taylor & McCaleb, P.A.
Elizabeth Newlin Taylor
Jolene L. McCaleb
Corrales, NM

for San Juan Water Commission

Law Office of Priscilla A. Shannon
Priscilla A. Shannon
Farmington, NM

for McCarty Trust et al., Stephen Albert McCarty, Trustee; and Estate of Mary McCarty, a/k/a Mary Louise McCarty, Deceased

Gary L. Horner
Farmington, NM

Pro Se

Public Service Company of New Mexico
Mikal M. Altomare, Corporate Counsel
Albuquerque, NM

for Tucson Electric Power Company and Public Service Company of New Mexico

Ute Mountain Ute Tribe
Office of General Counsel
Leland Begay, Associate General Counsel
Peter Ortego
Lee Bergen
Towaoc, CO

Samuel L. Winder
Albuquerque, NM

for Ute Mountain Ute Tribe

C. Brad Lane Cates
Fairacres, NM

for Amici Paul Bandy, Steve Neville, and Carl Trujillo

## OPINION

**BLACK, Judge.**

**Factual and Procedural Background**

{1}    In 1849, after years of intermittent warfare, the United States entered into a peace treaty with the Navajo Tribe (Navajo Nation). *See Treaty With the Navaho*, September 9, 1849, 9 Stat. 974 (Treaty of 1849). That treaty subjected the Navajo Nation and its people to the sovereignty and rule of the United States and recognized the existence and legitimacy of a territory to be dedicated to the Navajo Nation. At the time, the federal government aspired to change the existing Navajo pastoral culture into one of more traditional Eastern-style farming and moved the Navajo Nation onto a reservation at Bosque Redondo, in what eventually became Eastern New Mexico. Following the Civil War, the federal government realized its agricultural goals for the Navajo Nation would involve a long and expensive process for which Bosque Redondo was ill-suited. A second treaty with the Navajo Nation in 1868 returned them to a portion of their ancestral territory as their "permanent home." *See Treaty With the Navaho* art. 13, June 1, 1868, 15 Stat. 667, 671 (Treaty of 1868).

{2}    The Colorado River drains the Colorado Plateau through the Grand Canyon. The San Juan River is the tributary of the Colorado River upon which the Four

Corners region[1] relies for surface water and is the largest river in New Mexico. The aboriginal lands of the Navajo Nation originally included the entire San Juan Basin. *Navajo Tribe of Indians v. United States of America*, 23 Ind. Cl. Comm. 244, 251 (1970). The San Juan still runs through a considerable portion of the Navajo Nation and is a water source much coveted in this arid portion of the country.

{3} In light of the Navajo Nation's potential claim for the majority of water in the San Juan River Basin, the State of New Mexico initiated a general stream adjudication to determine the water rights of the major claimants. The United States asserted claims as trustee for the Navajo Nation, and the Navajo Nation intervened on its own behalf. Following years of litigation, the State entered into settlement negotiations with the Navajo Nation and the United States. The State proposed a blueprint for a settlement and held public meetings in Farmington and Bloomfield seeking input from the non-Indian water users. In response to substantial public input, the State revised its settlement proposals.

{4} In 2005, following more than a decade of negotiation, the Navajo Nation, the United States, and the State of New Mexico (collectively, Settling Parties) reached an agreement (the Settlement Agreement) settling the Navajo Nation's claims to water

---

[1]The "Four Corners" is the designation given to the point where Colorado, Utah, Arizona, and New Mexico meet.

2

in the San Juan River Basin (the Basin). Federal legislation to approve and implement the Settlement Agreement was enacted by Congress in 2009 under the Omnibus Public Land Management Act of 2009, Northwestern New Mexico Rural Water Projects Act, Pub. L. No. 111-11, § 10301, 123 Stat. 991 (2009) (Settlement Act), and signed by the President. The New Mexico Legislature then appropriated $50 million to pay New Mexico's cost of the Settlement Agreement and authorized the New Mexico State Engineer to bring a lawsuit seeking judicial approval regarding the State's share of the water, pursuant to NMSA 1978, Section 72-1-12 (2005). *See* State of New Mexico, Office of the State Engineer, 2017 Indian Water Rights Settlement Fund Report, 3-4 (2017), *available at* https://www.nmlegis.gov/handouts/IAC%20112717%20Item%206%20Office%20 of%20the%20State%20Engineer%202017%20Indian%20Water%20Rights%20Se ttlement%20Fund%20Report.pdf; *see also* United States Department of the Interior Bureau of Reclamation, Navajo-Gallup Water Supply Project: Cost Share Agreement Between the United States and the State of New Mexico, 11 (2011), *available at* http://www.ose.state.nm.us/Legal/settlements/NNWRS/NavajoSettlement/NGWS P-OriginalCostShareAgreement.pdf. In the subsequent suit the settling parties asked the San Juan County District Court to approve the water rights previously allocated in congressional legislation for the Navajo Indian Irrigation Project (NIIP),

3

Fruitland-Cambridge Irrigation Project, Hogback-Cudei Irrigation Project, Navajo Gallup Water Supply Project (NGWSP), Animas-La Plata Project (ALP), San Juan River municipal and industrial uses, reserved groundwater, and rights based on stock, irrigation, and recreational uses as of January 1, 2011. Others with an interest in the Settlement Agreement were invited into this *inter se* proceeding through widely distributed radio announcements, newspaper notices, and over 19,000 first-class letters to those water rights holders who had title of record.

{5} At the initiation of the proceedings, the district court imposed an unusually stringent evidentiary burden on the Settling Parties to prove the Settlement Agreement was fair, adequate, reasonable, and in the public interest.[2] After giving all other water rights claimants in the Basin notice and opportunity to participate and to conduct discovery and file dispositive motions in accordance with Rule 1-071.2 NMRA, the district court entered its order granting the settlement motion for entry of partial final decrees describing the water rights of the Navajo Nation. The court

---

[2]Normally in an inter se proceeding, the parties objecting to a settlement have the burden to prove the settlement is not fair, adequate, or reasonable. *See State ex rel. State Eng'r v. Aamodt*, 582 F. Supp. 2d 1313, 1317 (D.N.M. 2007); *In re Crow Water Compact*, 2015 MT 353, ¶ 28, 382 Mont. 46, 364 P.3d 584. In the present case the district court shifted this burden to proponents of the Settlement Agreement. Moreover, the district court did not require those challenging the Settlement Agreement to make a showing that it would affect their rights, as is usually required. *See State ex rel. Office of the State Eng'r v. Lewis*, 2007-NMCA-008, ¶ 16, 141 N.M. 1, 150 P.3d 375.

4

then entered the partial final judgment and decree of the water rights of the Navajo Nation and the supplemental partial final judgment and decree of the water rights of the Navajo Nation (Proposed Decrees). The non-settling parties objected to several terms of the Settlement Agreement and to the inter se procedures adopted by the district court. After full briefing and argument, the district court rejected the objections and issued its order approving the Settlement Agreement and Proposed Decrees (the Settlement Order).[3] In the Settlement Order, the district court concluded that the Settlement Agreement was fair, adequate, reasonable, and consistent with the public interest as well as all applicable laws.

{6}     Appellants herein, the San Juan Acequias, are non-settling parties to the underlying proceedings that preceded the Settlement Agreement. Despite having virtually all issues in common with other non-settling parties, each has consistently refused to consolidate their appeals, failed to comply with filing deadlines, and neglected to follow rules of procedure or standard practice. Therefore, it will be necessary to address their claims in separate opinions. The San Juan Acequias challenge more than fifty aspects of the district court's conclusions. However, since this Court finds essentially all of these are based on faulty factual and/or legal

---

[3]For purposes of this opinion, when discussed jointly the Settlement Agreement and Settlement Order are referred to as "the Settlement."

5

premises, we will dispose of them categorically rather than attempt to answer each challenge separately.

**Standard of Review**

{7} " 'It is the policy of the law and of the State of New Mexico to favor settlement agreements.' " *Am. Civil Liberties Union of N.M. v. Duran*, 2016-NMCA-063, ¶ 50, 392 P.3d 181 (quoting *Navajo Tribe of Indians v. Hanosh Chevrolet-Buick, Inc.*, 1988-NMSC-010, ¶ 3, 106 N.M. 705, 749 P.2d 90). New Mexico courts therefore "hold such agreements in high regard and require a compelling basis to set them aside." *Builders Contract Interiors, Inc. v. Hi-Lo Indus.*, 2006-NMCA-053, ¶ 7, 139 N.M. 508, 134 P.3d 795. Appellate courts review a trial court's decision to approve a settlement decree only to determine if there was an abuse of discretion. *See, e.g.*, *Platte v. First Colony Life Ins. Co.*, 2008-NMSC-058, ¶ 7, 145 N.M. 77, 194 P.3d 108; *In re Norwest Bank of N.M., N.A.*, 2003-NMCA-128, ¶ 22, 134 N.M. 516, 80 P.3d 98; *Johnson v. Lodge #93 of Fraternal Order of Police*, 393 F.3d 1096, 1102 (10th Cir. 2004).

**I.   New Mexico Statutes Refute Appellants' Claim That the Settlement Required the Express Approval of the New Mexico Legislature and Any Such Claim Should Have Been Raised by Writ**

{8} Appellants maintain that the Settlement is void under New Mexico law without the express prior approval of the New Mexico Legislature. Initially it must be noted

Appellants' brief in chief fails to include any indication of how this issue (and indeed most others) was presented to the district court. This violation of Rule 12-318(A)(4) NMRA makes this Court's job much more difficult. *See State v. Gomez*, 1997-NMSC-006, ¶ 14, 122 N.M. 777, 932 P.2d 1 (stating that "an appellate court will consider only such questions as were raised in the lower court" (internal quotation marks and citation omitted)); *State v. Lucero*, 1993-NMSC-064, ¶ 11, 116 N.M. 450, 863 P.2d 1071 (noting that the appellate court should not have to guess what trial issues were preserved for appeal).

{9}    Appellants recite several iterations of the theme that the Settlement was unauthorized or in violation of New Mexico law. For example, Appellants argue inter alia that the Settlement violates the New Mexico Constitution's separation of powers. This is based on the premise that Governor Richardson lacked the power to sign the Settlement without prior legislative approval. They further contend that through the Settlement, Governor Richardson attempted to infringe the plenary jurisdiction of the New Mexico Courts under Article VI of the New Mexico Constitution.

{10}    This contention, like Appellants' entire appeal, is based on a failure to understand the nature of the relationship between Indian nations and the United States government as well as the structure of federalism. It is compounded by a

misconception of New Mexico water law procedure and the role of the New Mexico State Engineer. We explain.

{11}     First, water is a commodity that can move in interstate commerce, and does so as the San Juan River crosses several state boundaries. Thus, it is ultimately subject to the control of the federal, not the state, government. *See Oneida Indian Nation v. Cty. of Oneida*, 414 U.S. 661, 667, 670 (1974); *cf. City of El Paso ex rel. Pub. Serv. Bd. v. Reynolds*, 597 F. Supp. 694, 704 (D.N.M. 1984) (stating that a state may not impermissibly burden transfer of interstate water). Although the state has an interest in regulating water within its boundaries, it lacks any ownership claim in such water. *Virginia v. Maryland*, 540 U.S. 56, 74 n.9 (2003) (noting that federal common law governs interstate bodies of water, ensuring that water is equitably apportioned between states and that no state harms another's interest).

{12}     Second, the creation of an Indian reservation generally involves the reduction and definition of a tribe's traditional homelands in return for a guarantee of permanent and protected territory. *See Winters v. United States*, 207 U.S. 564, 576 (1908). Indian tribes thus have a proprietary interest in waters recognized by federal reservation treaties. *See* A. Dan Tarlock, *Law of Water Rights & Resources* § 9:38 (2016). It follows that the creation of an Indian reservation creates a strong presumption that state law does not apply to the Indians or their property. *See Bryan*

8

*v. Itasca Cty.*, 426 U.S. 373, 376 n.2 (1976); *see generally Moe v. Confederated Salish & Kootenai Tribes of the Flathead Reservation*, 425 U.S. 463, 474 n.13 (1976). It is therefore federal, not state, law that governs the validity and interpretation of water settlements between states and tribes. *Arizona v. San Carlos Apache Tribe of Ariz.*, 463 U.S. 545, 571 (1983).

{13}    Third, intergovernmental agreements are particularly useful because they provide benefits beyond what "ordinary state regulation" allows. New Mexico's entry into the congressionally sanctioned intergovernmental agreement as part of the Settlement involved herein reinforces federal preemption of state control over the Navajo Nation's portion of the waters of the San Juan. The Settlement Agreement at issue herein expressly states, "Congress approves, ratifies, and confirms the Settlement." Such a congressionally approved settlement preempts the law of the participating states. *Cf. Texas v. New Mexico*, 462 U.S. 554, 564 (1983) (discussing the effect of congressional consent on a settlement entered into pursuant to the Compact Clause); *N.Y. Shipping Ass'n Inc. v. Waterfront Comm'n of N.Y. Harbor*, 835 F.3d 344, 348 n.4 (3rd Cir. 2016) (same). Therefore a compact between interstate authorities may not be impaired by the participating states once approved by Congress. *See Kansas v. Nebraska*, ___ U.S. ___, ___, 135 S. Ct. 1042, 1053 (2015).

{14} Against this backdrop, the Settlement Agreement interpreted by the district court herein was approved by Congress well prior to Appellants' state law challenges, and thus, federal preemption disposes of many of their arguments, to wit: (1) the Settlement is a nullity because it was not approved by the New Mexico Legislature; (2) the Interstate Stream Commission violated NMSA 1978, Section 72-14-3 (1935), in failing to submit the Settlement to the New Mexico Legislature; and (3) the Settlement violates NMSA 1978, Section 72-1-11(C)(1) (2005) by not addressing all of the Navajo Nation's water needs. *See W. Va. ex rel. Dyer v. Sims*, 341 U.S. 22, 28 (1951) (stating that the United States Supreme Court has the final power to pass on the meaning and validity of compacts); *Corr v. Metro. Wash. Airports Auth.*, 800 F. Supp. 2d 743, 758-59 (E.D. Va. 2011) (noting that once a compact has been adopted, it is "transform[ed] into federal law at which time its interpretation and construction presented federal, not state questions"). Moreover, this Court would note the New Mexico Legislature has given the Attorney General the authority to prosecute and settle civil litigation to which the State is a party pursuant to NMSA 1978, Section 36-1-22 (1875-76). Even more to the point, it is clear that the Legislature has delegated to the Attorney General the explicit authority to initiate, conduct, dismiss, and compromise litigation on behalf of the State. *See* NMSA 1978, § 8-5-2 (1975); § 36-1-22; NMSA 1978, § 72-4-15 (1907); *Lyle v. Luna*, 1959-NMSC-042, ¶¶ 23-24,

10

65 N.M. 429, 338 P.2d 1060. The State Engineer, who also approved the Settlement, also acted with the expressly delegated authority of the Legislature.[4] Were it necessary to address this argument further, the Court notes—as did the district court—that the New Mexico Legislature has provided express authority for the State Engineer to specifically engage in this litigation and has appropriated over $50 million as the State's share of the cost of the Settlement. *See* § 72-1-12. To argue that the Legislature did not authorize the Governor and Attorney General to enter into this Settlement, then, is at best illogical, and more to the point, incorrect.

{15}    Even under New Mexico rather than federal law, then, Appellants are incorrect in their premise that the Legislature was required to approve the Settlement. However, assuming any of these state law arguments had merit, they should have been tested before the United States Congress stamped its imprimatur on the Settlement by adopting it into federal law. To the extent Appellants' state law arguments had merit, they should have been brought to the attention of the New

---

[4]The Legislature has likewise delegated to the State Engineer authority to supervise "the apportionment of water in this state according to the licenses issued by him and his predecessors and the adjudications of the courts." NMSA 1978, § 72-2-9 (1907); *see also* NMSA 1978, § 72-2-1 (1982) (providing that the State Engineer "has general supervision of waters of the state and of the measurement, appropriation, [and] distribution thereof"); *Tri-State Generation & Transmission Ass'n v. D'Antonio*, 2012-NMSC-039, ¶ 34, 289 P.3d 1232 ("[T]he Legislature has delegated the complicated and difficult task of managing New Mexico's scarce water resources to the State Engineer[.]").

Mexico Supreme Court by a writ of mandamus and are no longer ripe for adjudication. *See State ex rel. Clark v. Johnson*, 1995-NMSC-048, ¶ 19, 120 N.M. 562, 904 P.2d 11 (stating that in certain circumstances, mandamus "is an appropriate means to prohibit unlawful or unconstitutional official action").

**II . State Law Limitations Do Not Control Navajo Water**

**A.  Indian Tribes Are Not Required to Prove Immediate Beneficial Use to Quantify Their Water Rights**

{16}    Appellants argue "[b]eneficial use is also an essential and explicit requirement of state law, including Article XVI of the New Mexico Constitution, ratified by Congress in 1911." As noted earlier, New Mexico state law does not control Navajo water allocations. We reiterate that to the extent Appellants are attempting to apply New Mexico water limitations in this instance, federal law has expressly pre-empted such state limitations. If Defendants are arguing the New Mexico Constitution controls the Settlement since Congress approved the Constitution in 1911, this is also incorrect. The Settlement Agreement was approved by Congress in 2009 and was intended by Congress to allocate Navajo water and is thus much more specific than the New Mexico Constitution, which makes no mention of the water allocated to the Navajo Reservation in 1868. Specific and later-enacted statutes control over general, earlier-enacted laws. *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974); *Nguyen v. United States*, 556 F.3d 1244, 1252-53 (11th Cir. 2009).

{17}     Apparently recognizing the invalidity of their state law arguments, Appellants further maintain that "[b]eneficial use is an essential requirement of every federal law governing the allocation of water in the arid West, including *Winters* and subsequent cases." *Winters*, to which Appellants refer, is indeed an early polestar in recognizing reservation water rights. However, as will become clear, it does not require immediate "beneficial use" as the only measure of Indian water rights. Professor Tarlock succinctly outlines the properly applicable legal principle for the allocation of reservation water:

> Indian water rights are proprietary rights. Reserved water rights . . . have a priority date, the date of the creation of the reservation, but they are not dependent on the application of water to beneficial use.

Tarlock, *supra*, § 9:38.[5]

---

[5]Courts and other legal scholars have repeatedly recognized this interpretation of reservation water rights. *See, e.g.*, *Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist.*, 849 F.3d 1262, 1272 (9th Cir. 2017); *Colville Confederated Tribes v. Walton*, 752 F.2d 397, 405 (9th Cir. 1985); *Navajo Nation v. United States Dep't of the Interior*, 34 F. Supp. 3d 1019, 1022 (D. Ariz. 2014), *aff'd in part, rev'd in part*, 876 F.3d 1144 (9th Cir. 2017); *United States v. Orr Water Ditch Co.*, 309 F. Supp. 2d 1245, 1248 (D. Nev. 2004); *In re Gen. Adjudication of All Rights to Use Water in Gila River Sys. & Source*, *(Gila V.)* 35 P.3d 68, 71-72 (Ariz. 2001) (en banc); *State of Wash. Dep't of Ecology v. Yakima Reservation Irrigation Dist.*, 850 P.2d 1306, 1330 (Wash. 1993) (en banc); *State of Montana ex rel. Greely v. Confederated Salish & Kootenai Tribes*, 712 P.2d 754, 762 (Mont. 1985); *United States ex rel. Ray v. Hibner*, 27 F.2d 909, 911-12 (D. Idaho 1928); Sally Fairfax, Helen Ingram & Leigh Raymond, *Historical Evolution & Future of Natural Resources Law & Policy, The Evolution of Natural Resources Law & Policy* 19 (Lawrence Macdonnell & Sarah F. Bates eds., 2010); Judith E. Jacobsen, *The Navajo*

13

{18}     Appellants attempt to bolster their interpretation of "beneficial use" as requiring immediate use by relying on inapplicable federal statutes such as the Reclamation Act of 1902, 43 U.S.C. § 372 (2012). They are correct that if this were indeed a Reclamation Act case, the Secretary of the Interior would be required to follow the state law interpretation of "beneficial use." However, they present no evidence or sound legal argument that the Reclamation Act applies here. Arriving more than forty years after the establishment of the Navajo Reservation, the 1902 Reclamation Act is clearly not the source of the federal government's authority to create the Navajo Reservation or reserve water rights to it and therefore does not constrain the use of reservation water.[6] *See Colville Confederated Tribes*, 752 F.2d at 405.

{19}     Appellants are also off base in attempting to graft language from the New Mexico Supreme Court regarding the Pueblo Water Rights doctrine onto the *Winters* doctrine. The Pueblo Water Rights doctrine derives from Spanish and Mexican property law—a unique source having no relationship to *Winters*. *State ex rel.*

*Indian Irrigation Project & Quantification of Navajo Winters Rights*, 32 Nat. Resources J. 825, 826 (1992). Hence, Appellants' assertion that "beneficial use is required by all the cases and statutes—except for *Gila V.* and the lower court's decision in this case" is, at the very least, misleading.

[6]The federal government has the power to reserve water under both the Commerce and Property clauses of the Federal Constitution. *Cappaert v. United States*, 426 U.S. 128, 138 (1976).

*Reynolds v. Aamodt*, 618 F. Supp. 993, 1010 (D.N.M. 1985); Tarlock, *supra*, § 9:39; William Goldfarb, *Water Law* 39 (2nd ed. 1988).

{20} Appellants are closer to the way the "beneficial use" concept has occasionally been referenced in the reservation context in their invocation of the Colorado River Compact. That Compact specifically acknowledges that its purpose is "to establish the relative importance of different beneficial uses of water." Moreover, that Compact expressly contemplated future uses beyond those existing in 1922. *See* NMSA 1978, § 72-15-5 (art. I) (1923).[7] Thus Compact water was not seen as frozen in time and can clearly be used at various times for various uses. That indeed is exactly how the district court properly employed the concept of "beneficial use" herein:

> [b]eneficial use shall be the limit of the rights to use water adjudicated to the Navajo Nation by this Decree. The Navajo Nation shall not be entitled to receive, nor the United States or the State of New Mexico be required to deliver, nor shall non-Navajo water users be required to curtail water uses to provide to the Navajo Nation any water not then necessary for beneficial use under the rights adjudicated herein or acquired hereafter.

{21} Additionally, the Colorado Compact explicitly provides that nothing in the Compact shall be construed as affecting the obligations of the United States of America to Indian tribes. *See* § 72-15-5 (art. VII); NMSA 1978, § 72-15-26 (art. XIX)

---

[7]The Settlement Act specifically recognizes the Colorado River Compact and adjusts water allocations to comply with it. Settlement Act § 10603(j).

15

(1949). The Settlement herein, as a specific and later-enacted statute, should thus be given precedence over a more general earlier statute. *See Morton*, 417 U.S. at 550.

{22} Appellants lastly dovetail their Colorado River Compact argument with reliance on the Colorado River Storage Project, which recites one of its purposes as "storing water for beneficial consumptive use." 43 U.S.C. § 620 (2012). But this language makes further clear that the water to which that Compact applies is not required to be put to immediate "beneficial consumptive use." Rather than supporting Appellants' argument, these sources indicate Navajo Nation rights should not be limited to the amount of water used on the reservation at the time of its dedication.

**B.      The District Court Properly Applied the *Winters* Doctrine and the Practicably Irrigable Acreage (PIA) Standard to Measure the Water Reserved to the Navajo Nation Under the Settlement Agreement**

{23} In *Winters*, the Gros Ventre Tribes in Montana, like the Navajos, had ceded the vast majority of their ancestral land by treaty to the United States in return for a permanent reservation. 207 U.S. at 567-68. When non-Indians on the Milk River upstream from the Gros Ventre reservation diverted all the available water, the United States sought an injunction to halt the upstream diversions. *Id.* at 565. Although the non-Indians had earlier water priority dates under Montana law, the district court held the tribes' rights under the treaty were superior. *Id.* at 576. The United States Supreme Court recognized it was inconceivable the tribes would have given up their

16

ancestral hunting grounds for land that had insufficient water to pursue the pastoral life the federal government wished to encourage. *Id.* It stated that since treaties must be construed in favor of the Indians it was implausible that the tribes intended to forfeit their water rights:

> The Indians had command of the lands and the waters,—command of all their beneficial use, whether kept for hunting, and grazing roving herds of stock, or turned to agriculture and the arts of civilization. Did they give up all this? Did they reduce the area of their occupation and give up the waters which made it valuable or adequate? And, even regarding the allegation of the answer as true, that there are springs and streams on the reservation flowing about 2,900 inches of water, the inquiries are pertinent. If it were possible to believe affirmative answers, we might also believe that the Indians were awed by the power of the government or deceived by its negotiators. Neither view is possible.

*Id.* (internal quotation marks omitted).

{24}     While the *Winters* case established a legal foundation that stood for the proposition that upriver use that deprived agricultural Indian reservations of available water was not consistent with treaties that established such reservations in the first instance, lower courts have grappled with how to calculate the water necessary to fulfill the needs and goals of other reservations. *Compare Conrad Inv. Co. v. United States*, 161 F. 829, 832 (9th Cir. 1908), *and United States v. Ahtanum Irrigation Dist.*, 236 F.2d 321, 327 (9th Cir. 1956), *with United States v. Walker River Irrigation Dist.*, 104 F.2d 334, 335-36, 339-40 (9th Cir. 1939), *and In re Yakima River Drainage Basin*, 296 P.3d 835, 839 (Wash. 2013) (en banc). In the Colorado River litigation,

17

the Supreme Court calculated the amount of "practicable irrigable acreage" (PIA) on reservations dedicated to agriculture and used that as a yardstick to allocate reservation water. *Arizona v. California,* 460 U.S. 605, 613 (1983). *Arizona* recognized that *Winters* made PIA the recognized baseline for measuring reservation water rights when the intent of the reservation was agriculture. *Id.* at 609-10. It did not, however, as Appellants argue, hold "that practicably irrigable acreage (PIA) is the only proper way to quantify federal reserved rights for Indian tribes." Nor did the Supreme Court adopt the appellants' view that the failure to put allotted water to immediate "beneficial use" results in a forfeiture of those water rights. Indeed, the Court noted the Chemehuevi Tribe had not diverted any of its allotted water. *See id.* at 653, n.8 (Brennan, J., concurring in part and dissenting in part).

{25}     Determining how to calculate PIA and what it means in less agricultural situations has required judicial resourcefulness. *See Walker River Irrigation Dist*., 104 F.2d at 340 (discussing water rights in relation to power generation); *United States v. Adair*, 723 F.2d 1394, 1411 (9th Cir. 1983) (discussing water rights in relation to hunting and fishing activities). In light of such difficulties, the judicial trend appears to recognize reservation allocations should not be limited to only an amount of water sufficient to support the pastoral life often contemplated in the nineteenth century, but rather, calculated to provide the tribes with water in quantities

18

sufficient to promote survival and the success of the reservations. *See Arizona v. California*, 439 U.S. 419, 422-23 (1979) (per curiam), *amended*, 466 U.S. 144 (1984); *Agua Caliente Band of Cahuilla Indians*, 849 F.3d at 1270; *Joint Bd. of Control of Flathead, Mission & Jocko Irrigation Dists. v. United States*, 832 F.2d 1127, 1131 (9th Cir. 1987); *Ahtanum Irrigation Dist.*, 236 F.2d at 327; *Adair*, 723 F.2d at 1410; *Colville Confederated Tribes v. Walton*, 647 F.2d 42, 47-48 (9th Cir. 1981); Tarlock, *supra*, § 9:41; Goldfarb, *supra*, at 51. *But see In re Gen. Adjudication of All Rights to Use Water in Big Horn River Sys.*, 753 P.2d 76, 94 (Wyo. 1988), *aff'd sub nom*, *Wyoming v. United States*, 492 U.S. 406 (1989), *abrogated on other grounds by Vaughn v. State*, 962 P.2d 149, 151 (Wyo. 1998).

{26}    Current jurisprudence thus tends to recognize the goal of the federal government in creating Indian reservations was not to produce more farmers or shepherds but "to make the reservation livable" and "to further[] and advance[] the civilization," allowing the Indians to change to new ways of life. *Arizona*, 460 U.S. at 616; *see* Martha C. Franks, *The Uses of the Practicably Irrigable Acreage Standard in the Quantification of Reserved Water Rights*, 31 Nat. Resources J. 549, 553-54 (1991); *Winters*, 207 U.S. at 567, 577. The ultimate objective of Congress was to see that "Indian treaty rights to a natural resource that once was thoroughly and exclusively exploited by the Indians secures so much as, but no more than, is

19

necessary to provide the Indians with a livelihood—that is to say, a moderate living." *Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 686 (1979).

{27}     In line with current judicial analysis, the district court herein recognized the fundamental purpose of the Navajo Reservation was to create a sustainable homeland for the tribe. Other than frequently repeating the PIA mantra, Appellants have offered no evidence or supportive authority to contradict the district court's finding. Indeed the only evidence to which this Court was directed by Appellants is consistent with that finding. *See* Treaty of 1868 art. XIII, 15 Stat. 667, 671 (stating that the Navajo tribe agrees to make the reservation "their permanent home") The district court's decision regarding the proper measure of reservation water is therefore not an abuse of discretion.

**III.     The District Court Properly Applied the Fair, Adequate, and Reasonable Standard to the Settlement of the Navajo Indian Irrigation Project (NIIP)**

{28}     Appellants make several challenges to the district court's award of water to the NIIP. Once again these challenges fail to understand the origins and scope of the Congressional direction for NIIP. *See Navajo Indian Irrigation Project*, Pub. L. No. 87-483, § 2, 76 Stat. 96 (1962) (the NIIP Act) (discussing the construction of the NIIP Act and its intended use). This Congressional mandate makes Appellants' discussion

of state or historic reservation concepts of beneficial use and PIA inapplicable for the same reasons previously outlined.[8]

{29} Congress specifically authorized the construction and operation of the NIIP Act "for the principal purpose of furnishing irrigation water to [a service area of not more than 110,630] acres of land[.]" NIIP Act § 2; *see* Settlement Act § 10402(a) (amending Section 2 of the NIIP Act). In so doing, Congress necessarily determined that up to 110,630 acres of NIIP lands are "irrigable and arable." NIIP Act, 76 Stat. at 96. Moreover, the Settlement Act amends the NIIP Act to significantly broaden the potential uses of NIIP water while confirming the amounts of Navajo diversion (508,000 acre-feet of water per year) and irrigated acreage (110,630) authorized for the project. Settlement Act § 10402(a). "Once reserved rights for Indian reservations have been quantified, they may be applied to any water uses chosen by the tribes." Goldfarb, *supra*, at 51.

{30} In the 1940s several Colorado River Basin states negotiated the Upper Colorado River Compact. Upper Colorado River Basin Compact, ch. 48, Pub. L. No.

---

[8]Appellants' arguments based on other federal laws are again unfounded. They rely on various resolutions, compacts, and statutes from the first half of the 20th century that include (at most) general references to the principle of beneficial use. Even if any of these general resolutions or statutes were applicable in this situation, which they are not, they would be superseded by the subsequent and more specific NIIP and Settlement statutes passed by Congress. *See Morton*, 417 U.S. at 550-51.

21

81-37, 31, 63 Stat. 31 (1949). Although it did not directly impact that Compact, at the time it was estimated the Navajo Nation could require about 787,000 acre-feet of water. Lloyd Burton, *American Indian Water Rights & the Limits of the Law* 30 (U. Press Kan. 1991). The United States Bureau of Reclamation and the Bureau of Indian Affairs then proposed a reclamation project of this approximate size for the Navajo Tribe. In the face of opposition from states adjoining the Colorado River, Congress refused to act. *Id.* The Navajo Tribal Council thereafter agreed to a guaranteed quantity of water—508,000 acre-feet annually—but to be shared with other San Juan users in drought years. The Council further agreed if such a project was completed, the Navajo Nation would not assert its 1868 date of appropriation to such water. *Id.* at 31. On this basis, the Navajo Nation along with the State of New Mexico then presented Congress with a joint Navajo-State project for the agreed portion of the San Juan River. In June of 1962, Congress passed the Act authorizing the construction and maintenance of NIIP and New Mexico's San Juan-Chama diversion. *See* NIIP Act, 76 Stat. at 96; 43 U.S.C. § 615ii (2000) (omitted from current version of the U.S.C.) (for a more detailed discussion of the history of NIIP, *see* Jacobsen, *supra*, at 825-32). Appellants' argument that Congress statutorily adopted the agreed amount of 508,000 acre-feet, but secretly expected a state judge to compute the Navajo Nation's share based on a PIA calculation, flies in the face of this history.

22

{31} In addition to specifying the sources, amounts, distribution, and purposes of the NIIP Act, Congress unambiguously provided:

> No person shall have or be entitled to have the use for any purpose . . . of water stored in Navajo Reservoir or of any other waters of the San Juan River and its tributaries originating above Navajo Reservoir to the use of which the United States is entitled under these projects except under contract satisfactory to the Secretary and conforming to the provisions of this Act.

NIIP Act § 11.

{32} Appellants argue that "Section 13(c) of the NIIP Act explicitly disclaims any Congressional intention to create a water right[.]" That section provides, in part, that "[n]o right or claim of right to the use of the waters of the Colorado River system shall be aided or prejudiced by" the Act. NIIP Act § 13(c). As the district court explained however, by reasoning with which we agree, this argument takes Section 13(c) totally out of its relevant context. Nothing in Section 13 prohibits the creation of individual water rights within the limitations of the Colorado River Compact.

## IV. The District Court's Procedure Complies With Statutory and Constitutional Requirements

{33} Appellants advance several challenges to the procedure adopted by the district court. These challenges exhibit a lack of comprehension of New Mexico statutory procedures for the allocation of water and how constitutional norms apply to those procedures.

23

**A. The District Court Did Not Err in Treating Appellants' "Cross Claims" as Objections to the Settlement**

{34} The New Mexico statutory inter se water procedure is specifically designed to allow the State Engineer to fairly allocate water to all users of a particular stream. *See* NMSA 1978, §§ 72-4-15 (1907), -17 (1965). As the district court explained, this statutory procedure does not follow the typical civil pattern of permitting claims, cross-claims, and counter-claims.[9] New Mexico statutes specifically allow the district court flexibility to adjudicate the senior water rights first, and then address junior claims. This procedure is efficient since it allows the district court to hear all claims against the State Engineer so it can be determined how much water the state will have to allocate. *See State ex rel. Office of State Eng'r v. Lewis*, 2007-NMCA-008, ¶ 30, 141 N.M. 1, 150 P.3d 375. That is exactly what the district court did here; Appellants' "cross claims" were treated as objections to the Settlement, and now the State Engineer knows how much water must be subtracted for the "senior" Navajo Nation claims before he calculates the junior claims. To litigate Appellants' "cross claims"

---

[9]On March 13, 1975, the State Engineer initiated the general stream adjudication on the San Juan River stream system by filing the complaint contemplated under Section 72-4-15 in district court. In accordance with the usual procedure in water rights proceedings, no "answer" was required or filed. *See State ex rel. State Eng'r v. Comm'r of Pub. Lands*, 2009-NMCA-004, ¶ 8, 145 N.M. 433, 200 P.3d 86.

and determine their exact water rights in the initial proceeding would destroy the purpose of an expedited inter se procedure. *See* Rule 1-071.2(B).

**B.      Notice of This Inter Se Proceeding Satisfied Constitutional Due Process**

{35}      To assert a procedural due process claim, an appellant must establish both a deprivation of a protected liberty or property interest and that he or she was not afforded adequate procedural protections. *Barreras v. N.M. Corr. Dep't*, 1992-NMSC-059, ¶ 18, 114 N.M. 366, 838 P.2d 983. "[T]he threshold question in evaluating a due process challenge is whether there is a deprivation of liberty or property." *Bounds v. State ex rel. D'Antonio*, 2013-NMSC-037, ¶ 51, 306 P.3d 457 (internal quotation marks and citation omitted). As the district court found, "the total amount of water [allocated to the Navajo Nation] in the Settlement Agreement is less than the Navajo Nation's currently, federally authorized rights to water pursuant to the 1962 NIIP Act and the long-established Hogback-Cudei and Fruitland-Cambridge irrigation projects" and thus there was a reasonable basis to conclude that the Settlement provides for less than the potential claims that could be secured at trial. Since these rights were secured by Congressional enactments and thus have preemptive effect, Appellants could not have suffered any loss of property rights. *In re Gen. Adjudication of All Rights to Use Water In the Gila River Sys. & Source*, 224 P.3d 178, 187 (Ariz. 2010) (en banc) (holding that no due process violation occurs

25

if a tribe is given no more water than they could secure at trial and claimants are given the right to advance claims to the remaining water).

{36}    If this Court could presume Appellants had a property loss, however, their assertion that the parties to the Settlement Agreement intentionally violated due process by failing "to use available data sources to identify and serve the defendants in the Navajo inter se" is not legally viable. Initially it ignores the fact that the settling parties were following the order of the district court and the requirements of Rule 1-071.2(C). Secondly it appears at least part of the problem arose from the failure of Appellants' counsel to supply the current names of all members of the various ditch associations that were available to Appellants. Appellants cannot complain of reversible error they invited and thereby caused. *See United States v. Lopez-Medina*, 596 F.3d 716, 732 (10th Cir. 2010); *State v. Jim*, 2014-NMCA-089, ¶ 22, 332 P.3d 870 ("It is well established that a party may not invite error and then proceed to complain about it on appeal."). The Settling Parties: (1) conducted five public meetings; (2) published the notice information and filing requirements once a week for four consecutive weeks in all local newspapers;[10] (3) publicized five public meetings where the Settlement was discussed by purchasing a quarter-page

---

[10]The *Gallup Independent*, *Navajo Times*, *Farmington Daily Times*, *Rio Rancho Observer*, *Rio Grande Sun*, and *Albuquerque Journal*.

26

advertisement or larger once a week for three consecutive weeks in the *Gallup Independent*, the *Farmington Daily Times*, and the *Navajo Times*; (4) publicized the five public meetings by purchasing thirty-second or longer local radio advertisements at least three times a day on the day before and the day of each public meeting; and (5) submitted a synopsis of each public meeting to the court for public inspection. Additionally the State used first-class mail to deliver notice to the over 19,500 potential water users in the State Engineer's records.

{37}   Due process requires only notice "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and to afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950); *see Bounds*, 2013-NMSC-037, ¶ 50. Reasonableness is a function of practical alternatives. *See Greene v. Lindsey*, 456 U.S. 444, 454 (1982). As this case illustrates, inter se water cases can involve thousands of potential claimants, and the limits of due process notice therefore require flexibility in this context. *See In re Rights to Use of Gila River*, 830 P.2d 442, 449-50 (Ariz. 1992); *Lu Ranching Co. v. United States*, 67 P.3d 85, 88-89 (Idaho 2003). The measures taken by the State herein satisfy the requirements of due process. *See In re Crow Water Compact*, 2015 MT 353, ¶ 39, 382 Mont. 46, 364 P.3d 584; *Jensen v. Morgan*, 844 P.2d 287, 290-91 (Utah 1992).

27

**C.     The District Court Did Not Abuse Its Discretion in Limiting the Time for Discovery**

{38}     The district court established an orderly and appropriate discovery process, which included an electronic repository for access to discovery documents and regional records repositories for inspection of the older archived government records.[11] Technical reports supporting the United States' and Navajo Nation's Statement of Claims and supporting documents were filed on January 30, 2012. Initial discovery began with the district court's February 3, 2012 order lifting the stay of discovery. Discovery was available to the non-settling parties beginning on April 2, 2012, when the settling parties made their initial disclosures. The parties were able to review documents, make discovery requests, and conduct depositions of the Settling Parties' witnesses at any time after February 3, 2012.

{39}     Under the court's scheduling order entered on August 7, 2012, discovery was originally set to close on February 1, 2013. On November 6, 2012, at the request of Appellants and others, the district court entered an order extending discovery. At the request of Appellants and the other non-settling parties, the district court granted

_____

[11]Appellants could then identify documents and repository staff would make the copies. When Appellants' counsel objected that documents must be made available in San Juan County, counsel for the United States informed the court and the non-settling parties that the non-privileged documents would be scanned onto a disk.

28

another extension of time for discovery until March 31, 2013. Discovery was thus available to Appellants for more than a year during which they sought no further discovery extensions.

**V.     Appellants' Assertions That the District Court Knowingly Admitted False or Inadmissible Evidence, Allowed the Destruction of Evidence and Ex Parte Contact, and Improperly Excluded Appellants' Evidence Are Unsupported and Subject to Sanctions**

{40}     Appellants argue the district court committed reversible error by intentionally admitting inadmissible evidence. Again, virtually all these arguments are based on Appellants' inability to comprehend the proper goals and procedure for an inter se water hearing. As we have reiterated, in such a proceeding, issues regarding settlement of other claims and necessity of a pipeline were not required to be addressed at the outset of litigation or alongside superior claims. Appellants' "equitable" arguments regarding global warming, lack of adequate water, the Engineer's failure to fairly allocate, shrinking Navajo population, endangered species, exclusion of other reserved federal water uses, and the failure to include Appellants in the inter se negotiations between the three governments also all miscomprehend the scope and legal effect of the congressional approvals in this case.

{41}     Due to the intemperate nature of some of Appellants' language however, this Court cannot fail to address one of their arguments. Appellants claim that

[t]he court abolished the requirement of a hydrographic survey, which is required by statute. [Sections] 72-4-13 through -17. *The court substituted a fake hydrographic survey* prepared by the United States and the Navajo Nation without any fieldwork. . . . This pseudo-hydrographic survey was a compilation of unverified information compiled by the adversarial claimants—the Navajo Nation and the United States—from unidentified sources.[12]

(Emphasis added.)

{42}    In fact the United States clearly created and produced the technical and extremely expensive hydrological report, and the State Engineer followed the usual procedure of adopting it. *See* NMSA 1978, § 72-4-16 (1919). The allegation that the court fraudulently substituted a fake hydrographic survey alleges a felony in New Mexico and is appropriately subject to judicial sanctions. *See* NMSA 1978, § 30-22-5 (2003); *see also Martin v. Essrig*, 277 P.3d 857, 860-61 (Colo. App. 2011); *Peters v. Pine Meadow Ranch Home Ass'n*, 2007 UT 2, ¶ 23, 151 P.3d 962. Appellants' claims alleging willful misconduct by the district court are rejected, and Appellants' counsel is strongly admonished not to advance any such frivolous and unfounded accusations in the future.

_____

[12]Appellants speculate that "a real hydrographic survey . . . would have identified many additional water owners who opposed the Navajo [Nation's] claim." This speculation is again a violation of the New Mexico Rules of Appellate Procedure and is not to be countenanced by this Court. *See* Rule 12-318(A).

{43}    Likewise, Appellants' allegations regarding ex parte contact are equally off base. Appellants' counsel states it appears violations of the prohibition against ex parte communication have "contributed to many instances in this and other cases where the basic rights of water owners have been sacrificed to accommodate the interests of the OSE." Appellants' counsel further posits the question, "Did the OSE engage in ex parte contacts to convince the judge that it would be too expensive for the three governments to search readily available public records?" Even more outrageously, without establishing any basis for the accusation of ex parte contact, Appellants' counsel goes on to smear the district judge by stating, "[t]he judge never made any disclosures, and never explained why not."

{44}    Truth is not a matter of convenience. "Lawyers are officers of the court and are always under an obligation to be truthful" with the judicial forum. *In re Stein*, 2008-NMSC-013, ¶ 35, 143 N.M. 462, 177 P.3d 513 (internal quotation marks and citation omitted). Making such allegations without offering a shred of proof is unprofessional and unethical. *In re Venie*, 2017-NMSC-018, ¶ 22, 395 P.3d 516. Appellant's counsel is cautioned that, in the future, such unsupported accusations and evidence-free speculation will not be so politely addressed by this Court, but will instead result in sanctions.

**CONCLUSION**

{45} For the above stated reasons this Court affirms the order of the district court finding the Settlement was fair, adequate, reasonable, and consistent with the public interest as well as all applicable New Mexico and federal laws.

{46} **IT IS SO ORDERED.**


_____
**BRUCE D. BLACK, Judge Pro Tem**

**WE CONCUR:**


_____
**LINDA M. VANZI, Chief Judge**


_____
**J. MILES HANISEE, Judge**